Burke, J.
On this appeal by the plaintiff from a judgment dismissing the complaint, the only issue is whether the courts of this State must deny access to a party seeking to enforce obligations validly entered into in the Commonwealth of Puerto Rico and enforcible under Puerto Rican law.
Plaintiff, the owner and operator of a government-licensed gambling casino in Puerto Rico, seeks to recover the sum of *13 $12,000 evidenced by defendant’s check and I. 0. IT.s given in payment of gambling debts incurred in Puerto Rico.
Once again we are faced with the question of when our courts may refuse to enforce a foreign right, though valid where acquired, on the ground that its “ enforcement is contrary to [the public] policy of the forum ” (Straus & Co. v. Canadian Pacific Ry. Co., 254 N. Y. 407, 414).
Since these gambling debts were validly contracted in Puerto Rico and the Puerto Rican law provides a remedy for their enforcement (United Hotels of Puerto Rico v. Willig, Puerto Rico Bar Assn., No. 172 [Oct. 9, 1963]), absent a clear showing that the enforcement of the causes of action here would “ offend our sense of justice or menace the public welfare ’ ’ (Loucks v. Standard Oil Co., 224 N. Y. 99, 110), we may not withhold aid. We do not think that public policy forbids us to enforce these contracts.
Substantially all of the commentators agree that foreign-based rights should be enforced unless the judicial enforcement of such a contract would be the approval of a transaction which is inherently vicious, wicked or immoral, and shocking to the prevailing moral sense. (Beach, Uniform Interstate Enforcement of Vested Rights, 27 Yale L. J. 656, 662; Goodrich, Conflict of Laws [3d ed., 1949], 305; 2 Rabel, Conflict of Laws: A Comparative Study [1947], 555-575; Paulsen and Sovern, “Public Policy ” in the Conflict of Laws, 56 Col. L. Rev. 969; 3 Beale, Conflict of Laws [1935], 1649.)
Applying this test we find decisions in this State involving gambling transactions which put this reasoning into practice. Over 100 years ago this court held in Thatcher v. Morris (11 N. Y. 437 [1854]) that a contract involving lottery tickets if legal and valid without the State would be upheld though illegal in New York. In Harris v. White (81 N. Y. 532 [1880]) suit was permitted for wages earned in out-of-State horse races at a time when horse racing was illegal in the State of New York. In Ormes v. Dauchy (82 N. Y. 443 [1880]) suit was upheld for commissions earned by placing extrastate lottery advertisements in out-of-State newspapers. Thus, aware of the common-law rule which barred the enforcement of gambling contracts and conscious that they were illegal and void in almost all the States of this country, the courts of this State took the *14 position, even in Victorian times, that there was no strong public policy to prevent the enforcement of such contracts according to the law of the place of performance. There is nothing suggested by the respondent which should persuade us that Judge Cardozo was wrong when he said in Loucks v. Standard Oil Co. (224 N. Y. 99, 111 [1918], supra): “The courts are not free to refuse to enforce a foreign right at the pleasure of the judges, to suit the individual notion of expediency or fairness. They do not close their doors unless help would violate some * * * prevalent conception of good morals ”.
It has, however, been urged that suits on gambling debts contracted validly elsewhere are contrary to two public policies of this State, i.e,, in this jurisdiction gamblers are outlaws, and all gambling contracts made with them are void. Worthy though such considerations be, they apply only to transactions governed by our domestic law. This court gave thought to such arguments recently and rejected them as an insufficient basis for projecting domestic philosophies of law to decision making in actions based on transactions governed by the law of another State (see Rubin v. Irving Trust Co., 305 N. Y. 288, 304 [1953] [dictum]; Matter of May, 305 N. Y. 486 [“ incestuous ” marriage] ; Zwirn v. Galento, 288 N. Y. 428; Benton v. Safe Deposit Bank, 255 N. Y. 260, 267; see, also, Palmer Nat. Bank v. Van Doren, 260 Mich. 310 [1932]; International Harvester Co. v. McAdam, 142 Wis. 114 [1910]; Milliken v. Pratt, 125 Mass. 374 [1878]; Biewend v. Biewend, 17 Cal. 2d 108 [1941]; Restatement, Conflict of Laws, New York Annotations, § 612, p. 389).
Public policy is not determinable by mere reference to the laws of the forum alone. Strong public policy is found in prevailing social and moral attitudes of the community. In this sophisticated season the enforcement of the rights of the plaintiff in view of the weight of authority would not be considered repugnant to the “public policy of this State”. It seems to us that, if we are to apply the strong public policy test to the enforcement of the plaintiff’s rights under the gambling laws of the Commonwealth of Puerto Rico, we should measure them by the prevailing social and moral attitudes of the community which is reflected not only in the decisions of our courts in the Victorian era but sharply illustrated in the changing attitudes of the People of the State of New York. *15 The legalization of pari-mutuel betting and the operation of bingo games, as well as a strong movement for legalized offtrack betting, indicate that the New York public does not consider authorized gambling a violation of “ some prevalent conception of good morals, [or] some deep-rooted tradition of the common weal.” (Loucks v. Standard Oil Co., supra, p. 111.)
The trend in New York State demonstrates an acceptance of licensed gambling transactions as a morally acceptable activity, not objectionable under the prevailing standards of lawful and approved social conduct in a community. Our newspapers quote the odds on horse races, football games, basketball games and print the names of the winners of the Irish Sweepstakes and the New Hampshire lottery. Informed public sentiment in New York is only against unlicensed gambling, which is unsupervised, unregulated by law and which affords no protection to customers and no assurance of fairness or honesty in the operation of the gambling devices.
In the present case there is no indication that the evils of gambling, which New York prohibits and Puerto Rico has licensed, will spill over into our community if these debts are enforced in New York courts. The New York constitutional provisions were adopted with a view toward protecting the family man of meager resources from his own imprudence at the gaming tables. (See Carter and Stone, Proceedings and Debates of the Convention, 567 [Hosford, 1821].)
Puerto Rico has made provision for this kind of imprudence by allowing the court to reduce gambling obligations or even decline to enforce them altogether, if the court in its discretion finds that the losses are “ [in an] amount [which] may exceed the customs of a good father of a family. ’ ’ (Laws of Puerto Rico Ann., tit. 31, § 4774.) This regulation is consistent with New York policy and would be properly considered in any case before a New York court which may be asked to enforce a Puerto Rican gambling debt.
There is nothing Immoral per se in the contract before us, but injustice would result if citizens of this State were allowed to retain the benefits of the winnings in a State where such gambling is legal, but to renege if they were losers.
The cases relied on by the respondent miss the mark.
*16 In the case of Mertz v. Mertz (271 N. Y. 466 [1936]) Judge Lehman, writing for the court, said that “ a disability to sue attached by our law to the person of a wife becomes an anomaly if another State can confer upon a wife, even though residing here, capacity to sue in our courts upon a cause of action arising there” (p. 474; emphasis added). As distinguished from the present case, in Mertz the court was faced with this State’s interest in the marital status situated here. As a practical matter, all the significant contacts of the case were with New York and the language of the opinion indicates that the court was in reality there making a choice of law decision of the kind that this court today follows under the nominal heading of the “ contacts ” doctrine.
In Flegenheimer v. Brogan (284 N. Y. 268 [1940]) the court nominally invoked the public policy doctrine, but was only concerned with the operation of the liquor control laws in this State. The court did not find the policy of other States so unjust or antisocial as to oblige the courts of our State to deny access to litigants seeking to enforce rights validly created there.
This court refused to enforce a tax claim asserted here by the plaintiff municipality in City of Philadelphia [Pa.] v. Cohen (11 N Y 2d 401 [1962], cert. den. 371 U. S. 934 [1963]) but in doing so relied heavily upon the specific terms of our statute which calls for the enforcement of such tax claims arising in other States if such other State will reciprocate on a New York tax claim. Pennsylvania, unlike most States, has no such reciprocity provision. Watts v. Malatesta (262 N. Y. 80 [1933]) was concerned with a New York statute and a situation involving betting in this State that was clearly unlawful under the statute.
Since a gambling debt is unenforeible when made in Nevada, courts in other States have no public policy issue to pass upon, and refusals elsewhere to enforce these claims are a mere application of Nevada law. (Hamilton v. Abadjian, 30 Cal. 2d 49 [1947] and the Nevada cases cited therein.) Nevada courts refuse to enforce gambling debts since the statutes of that State, while specifically authorizing licensed gambling casinos (as an exception to the policy there that gambling generally is illegal), make no provision for their enforcement. (West Indies v. First Nat. Bank of Nevada, 67 Nev. 13.) In Puerto Eico the situation is different. There is specific statutory provision *17 for the enforcement of legal gambling debts there (Laws of Puerto Rico Ann., tit. 31, § 4774) and the Supreme Court of Puerto Rico has upheld the enforcement of such claims. (United Hotels of Puerto Rico v. Willig, Puerto Rico Bar Assn., No. 172 [Oct. 9, 1963], supra.) The refusal of courts to enforce Nevada gambling debts has no application to the case before us.
We think, therefore, that this ease falls within the consistent practice of enforcing rights validly created by the laws of a sister State which do not tend to disturb our local laws or corrupt the public.
Accordingly, the judgment of the Appellate Division should be reversed and the judgment of the Supreme Court, New York County, reinstated, with costs in this court and in the Appellate Division.