**NATIONAL RECOVERY SYSTEM, DIVISION ASSIGNEE OF CAESARS TAHOE CORPORATION, Plaintiff,**

v.

**Dennis KASLE, Defendant.**

**No. 86–CV–71175–DT.**

United States District Court, E.D. Michigan, S.D.

June 8, 1987.

Leonard Nathanson, Southfield, Mich., for plaintiff.

Walter Goldsmith, Birmingham, Mich., for defendant.

**MEMORANDUM OPINION AND ORDER**

ZATKOFF, District Judge.

## I. INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment.

Defendant claims that the contract between Defendant and Plaintiff's assignor is void as against Michigan law. Plaintiff has responded and this matter is ripe for disposition.

Relevant to the determination of Defendant's motion is a Request for Admissions sent by Defendant to Plaintiff in December of 1986. Since Plaintiff has not responded to them, the facts contained therein are treated as if true. F.R.Civ.P. 36.

Summary judgment is appropriate where no genuine issue of material fact remains to be decided and the moving party is entitled to judgment as a matter of law. *Blakeman v. Mead Containers*, 779 F.2d 1146 (6th Cir.1986); Fed.R.Civ.P. 56(c). In applying this standard, the Court must view all materials offered in support of a motion for summary judgment, as well as all pleadings, depositions, answers to interrogatories, and admissions properly on file in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 911 L.E.2d 202 (1986); *United States v. Diebold*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Smith v. Hudson*, 600 F.2d 60 (6th Cir.1979), *cert. dismissed*, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 2115 (1979). In deciding a motion for summary judgment, the Court must consider "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at ___, 106 S.Ct. at 2512.

Defendant, a Michigan resident, traveled to Nevada for the purpose of gambling. While in Nevada, Defendant borrowed funds to gamble with from the Caesers Tahoe Corporation. Instead of cash Defendant received gambling chips. Defendant lost these chips at the gaming tables in Plaintiff's casino. The total amount borrowed was $27,000. Defendant made one $500 payment on the loan transaction, but has failed to pay the remaining balance. Plaintiff, the assignee of the loan agreement, has now brought this suit against the Defendant for the remainder of the debt.

Subject matter jurisdiction is based on diversity. 28 U.S.C. § 1332.

## II.  THE APPLICABLE STATE LAWS

Defendant argues that the loan arrangement between Plaintiff's assignor and Defendant is void as against the laws and public policy of Michigan. Specifically, Defendant relies on M.C.L.A. § 600.2939(3) which provides:

(3) Instruments given in gaming or betting, validity. All notes, bills, bonds, mortgages, or other securities or conveyances whatever, in which the whole or any part of the consideration, shall be for any money or goods won by playing at cards, dice, or any other game whatever, or by betting on the sides or hands of such as are gaming, or by any betting or gaming whatever, or for reimbursing or repaying any moneys knowingly lent or advanced for any gaming or betting, shall be void and of no effect, as between the parties to the same, and as to all persons, except such as shall hold or claim under them in good faith, and without notice of the illegality of such contract or conveyance.

Plaintiff requests that this Court apply Nevada law to enforce the contract and thus grant recovery in favor of the Plaintiff. In Nevada, gambling debts are unenforceable. Neither a gaming establishment nor a patron can maintain an action for recovery of a gambling debt. *State Gaming Control Board v. Breen*, 99 Nev. 320, 661 P.2d 1309 (1983); *West Indies v. First National Bank*, 67 Nev. 13, 214 P.2d 144 (1950). However, when a loan agreement is made to engage in gambling ventures not between the parties, the loan is valid. *Sigel v. McEvoy*, 101 Nev. 623, 707 P.2d 1145 (1985).

In *Sigel, supra*, the plaintiff loaned the defendant money to enter into a poker series held in Las Vegas, Nevada. In return, the defendant agreed to pay plaintiff twenty (20) percent of his winnings. The defendant won approximately $657,000 in the tournament. When plaintiff sought repayment on the loan, defendant refused to pay claiming that the transaction was an illegal

gambling debt unenforceable under Nevada law. Plaintiff instituted suit, but the claim was dismissed by the trial court. Plaintiff appealled to the Supreme Court of Nevada.

In a *per curiam* decision, the Court reversed the trial court. 707 P.2d at 1147. Specifically, the *Sigel* court found that the loan agreement was properly characterized as a legitimate business arrangement and not a gaming debt. 707 P.2d at 1146. The court distinguished between loans made between parties who enter into wagering among themselves, and loans made between parties where the parties are to share the benefits. *Id.* 707 P.2d at 1146 n. 1. As stated by the *Sigel* court:

> "We can perceive of no logical basis for distinguishing between loans made to private individuals to engage in lawful wagering and loans made to casinos to engage in the same activities, where the ultimate purpose of the loans in both instances is to divide the benefits of any profits accrued from the wagering." *Id.* 707 P.2d at 1147 (footnote omitted).

The *Sigel* court upheld the agreement between the parties.

█ The matter before this Court closely resembles *Sigel*. There was no wager between the Plaintiff and Defendant herein. Instead, Plaintiff's assignor advanced Defendant a loan which was to be repaid regardless if Defendant won or lost. For Defendant to claim that this transaction is an illegal gambling debt misses the entire process of how the debt was incurred. Therefore, the Court holds that the loan transaction between Plaintiff's assignor and Defendant does not violate Nevada law.

Plaintiff requests that this Court apply Nevada law thus making the loan agreement legal and enforceable. Defendant requests that this Court apply Michigan law, and argues that M.C.L.A. § 600.2939(3) invalidates the debt. The Court must determine which state law applies to this transaction.

█ A federal court sitting in diversity must apply the substantive laws of the forum state. *Erie R.R. Co. v. Tompkins,*

304 U.S. 64, 58 S.Ct. 817, 82 L.Ed.2d 1188 (1938); *Hanna v. Plumer*, 380 U.S. 460, 471–72, 85 S.Ct. 1136, 1144, 14 L.Ed.2d 8 (1965). Further, courts in diversity apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *General Motors Corp. v. Nat'l Auto Radiator Mfg. Co.*, 694 F.2d 1050 (6th Cir.1982) (*per curiam*); *Korzetz v. Amsted Ind., Inc.*, 472 F.Supp. 136 (E.D. Mich.1979). The general rule in Michigan is that the validity of a contract is determined by the law of the situs, or where the contract was entered into. *Rubin v. Gallagher*, 294 Mich. 124, 128, 292 N.W. 584 (1940). "Generally speaking, a contract is deemed to have been made in the state where the last act necessary to make it a binding agreement took place." *State of Ohio v. Eubank*, 295 Mich. 230, 233–34, 294 N.W. 166 (1940). However, if the place of performance is different than the place of contracting, then the place of performance governs whether the contract is valid. *Liberty Mutual Ins. Co. v. Vanderbrush Sheet Metal Co.*, 512 F.Supp. 1159 (E.D. Mich.1981). In this matter, the place of making and place of performance are both in Nevada.

Defendant, however, points to another exception to this rule. Specifically, Defendant argues that Michigan's public policy would be offended if this Court granted Plaintiff's relief. If enforcement of a contract would violate Michigan public policy, the Court is unable to enforce the contract. *Miller v. Radikopf*, 394 Mich. 83, 88, 228 N.W.2d 386 (1975) (enforcement of a contract will be denied if the consideration given is illegal). See also *Olmstead v. Anderson*, 428 Mich. 1, 10, 400 N.W.2d 292 (1987). The *Miller* court explained the reasoning behind the public policy exception as follows:

> Judicial nonenforcement of agreements deemed against public policy is considered a deterrent to those who might otherwise become involved in such transactions.

\*     \*     \*     \*     \*     \*

It is consonant with the public policy of this state to encourage performance of legal contracts and to foster the just resolution of disputes.

394 Mich. at 89, 228 N.W.2d 386.

In a footnote, the *Miller* court cited the case of *Intercontinental Hotels Corp. v. Golden,* 15 N.Y.2d 9, 203 N.E.2d 210, 254 N.Y.S.2d 527 (1964). 394 Mich. at 89 n. 6, 228 N.W.2d 386. The facts of *Golden* are strikingly similar to those at bar. A New York defendant traveled to Puerto Rico where he incurred a gambling debt. The defendant then attempted to shield himself from liability based on New York law which prohibited enforcement of gambling debts. In denying defendant's defense, the court noted that public policy is not determinable by reference to the laws of the forum, but that the court should look to the prevailing moral and social attitudes. 203 N.E.2d at 212–213, 254 N.Y.S.2d at 530–531. See also *Eskovitz v. Berger,* 276 Mich. 536, 541, 268 N.W. 883 (1936). The *Golden* court noted that the trend in New York was the acceptance of gambling transactions as morally acceptable:

> "Our newspapers quote the odds on horse races, football games, basketball games and print the names and winners of the Irish Sweepstake and the New Hampshire lottery. Informed public sentiment in New York is only against unlicensed gambling, which is unsupervised, unregulated by law and which affords no protection to customers and no assurance of fairness or honesty in the operation of the gambling devices."

203 N.E.2d at 213, 254 N.Y.S.2d at 531. In permitting the plaintiff to collect the debt, the *Golden* court held:

> "That this case falls within the consistent practice of enforcing rights validly created by the laws of a sister state which do not tend to disturb our local laws or corrupt the public."

*Id.* 203 N.E.2d at 214, 254 N.Y.S.2d at 533.

In this matter, the Court must determine whether Michigan's public policy would deny Plaintiff's recovery.

## III. MICHIGAN'S GAMBLING LAWS AND PUBLIC POLICY

### A. THE GENERAL LAW

As a general rule, Michigan has constantly restricted the scope of gambling permitted within its boundaries. On April 27, 1827, the Legislative Council of the Territory of Michigan passed an anti-gambling statute which provided in pertinent part:

> "Whereas the practice of gaming for money or other property, is not only injurious in a high degree to the individuals concerned therein, but also, in its tendency, ruinous and destructive to the community: Therefore,
>
> Sec. 1. Be it enacted by the Legislative Council of the Territory of Michigan, *That all notes,* bonds, bills, judgments, mortgages, or other securities or conveyances whatsoever, *where the whole or any part of the consideration* of the same *shall be for any money or other valuable thing* whatsoever, *won by gaming,* or playing at cards, dice, or any other game or games whatsoever, or by betting on the side or hands of any person gaming, *or for the reimbursement or repaying of any money knowingly lent or advanced for any gaming or betting,* or lent and advanced at the time and place of such play, to any person or persons gaming or betting, or who shall during such play so play or bet, *shall be void and of no effect;* and when such mortgages, securities, or other conveyances, shall be of lands, tenements or other hereditaments, or shall be such as encumber or affect the same, such mortgages, securities or other conveyances, shall accrue and be to the sole use and benefit of such person or persons as should or might have been entitled to such lands, tenements or hereditaments, in case the said grantor or grantors thereof, or the person or persons so encumbering the same, had been naturally dead; and that all grants and conveyances so made, for the prevention of such lands, tenements and hereditaments from coming to or devolving upon such person or persons, hereby intended to enjoy the same as aforesaid, shall be deemed

fraudulent, void, and of no effect or purpose whatever." (emphasis added).

*Laws of the Territory of Michigan (1827).* The territorial law also required that those criminally convicted of gambling could be fined up to five times the dollar amount of the wager. Under the current Michigan statute, those convicted of gambling may have to spend one (1) year in jail and pay a fine of not more than five hundred ($500.00) dollars.[1] This state penal statute, M.C.L.A. § 750.301, provides:

> Sec. 301. ACCEPTING MONEY OR VALUABLE THING CONTINGENT UPON RESULT OF CONTEST OR HAPPENING OF UNCERTAIN EVENT—Any person or his agent or employee who shall, directly or indirectly take, receive or accept from any person any money or valuable thing with the agreement, understanding or allegation that any money or valuable thing will be paid or delivered to any person where such payment or delivery is alleged to be or will be contingent upon the result of any race, contest or game or upon the happening of any event not known by the parties to be certain, shall be guilty of a misdemeanor, punishable by imprisonment in the county jail not more than 1 year or by a fine of not more than 500 dollars.

Michigan territorial law also granted the loser of the gambling activity the authority to bring a civil suit against the winner to recover the gambling loss. After attaining statehood, the Michigan legislature enacted a similar statute which stated:

> "Any person that shall lose any sum of money, or any goods or articles of value, by playing or betting on cards, by any other device in the nature of such playing and betting, and shall pay or deliver the same or any part thereof to the winner, the person paying or delivering the same may sue for and recover such money in an action for money had and received to the use of the plaintiff ..."

1 How.Stat. § 2023. Later this statute was amended to:

> "And any person that shall lose any sum of money, or any goods or articles of value, by playing or betting on cards, or by any other device in the nature of such playing and betting, and shall pay or deliver the same or any part thereof to the winner, the person so playing or delivering the same may sue for and recover such money in action for money had and received, to the use of the plaintiff; and such goods or other articles of value in an action of replevin, or the value thereof in an action of trover, or in a special action on the case."

2 Comp.Laws § 5929 (2 Comp.Laws 1915, § 1795). The current statute, M.C.L.A. § 600.2939, holds:

> "(1) Action by loser and prosecution. In any suit brought by the person losing any money or goods, against the person receiving the same, when it appears from the complaint that the money or goods came to the hands of the defendant by gaming, if the plaintiff makes oath before the court in which such suit is pending, that the money or goods were lost by gaming with the defendant as alleged in the complaint, judgment shall be rendered that the plaintiff recover damages to the amount of the said money or goods, unless the defendant makes oath that he did not obtain the same, or any part thereof by gaming with the plaintiff; and if he so discharges himself, he shall recover of the plaintiff his costs; but the plaintiff may at his election, maintain and prosecute his action according to the usual course of proceeding in such actions at common law."

Thus, while the common law left the parties *in pari delicto*, these statutes allowed recovery. See *Lassen v. Karrer*, 117 Mich. 512, 76 N.W. 73 (1898).

Although Michigan criminalizes gambling, there are many instances where the legislature has legalized gaming. These will be discussed later in this opinion. As a general rule, however, the State finds gambling illegal because:

> "in enacting the gambling laws, the Legislature was attempting to alleviate the

---

**1.** M.C.L.A. §§ 750.314, 750.315.

evils inherent in unregulated gambling such as cheating or fraud and the possibility that an individual might become so affected by such activity as to fail to care for the needs of himself or his family and become a charge on society. The Legislature has the right to conclude that gambling is injurious to the morals and welfare of the people and it is clearly within the scope of the state police power to suppress gambling in all of its forms. See *Parkes v. Judge of Recorder's Court*, 236 Mich. 460; 210 N.W. 492 (1926)."

*Oakland County Prosecuting Atty v. 46th Judicial District Judge*, 76 Mich.App. 318, 326, 256 N.W.2d 776 (1977), *app after remand, People v. Bageris*, 94 Mich.App. 396, 288 N.W.2d 439 (1979).

### B. MICHIGAN DEFINES GAMBLING

Michigan courts have held that "[g]ambling occurs whenever there is a chance for profit if the player at the game is skilled or lucky." *Automatic Music & Vending Corp. v. Liquor Control Com'n*, 141 Mich. App. 458, 464, 367 N.W.2d 413 (1985). Gaming includes cards, dice, or other contrivance which is used to determine a winner or loser of the game. Betting is the wagering of money, goods, or other objects of value that something will or will not happen. *Shaw v. Clark*, 49 Mich. 384, 13 N.W. 786 (1882). "In a wager contract both parties take a risk; if one gains the other loses. Both jeopardize something. If the unlawful intent is entertained by only one of the parties the transaction is not illegal." *Wilkie v. Weller*, 222 Mich. 664, 669, 193 N.W. 235 (1923).

Michigan courts have had difficulty in determining what acts or activities constitute gambling. For instance, in *Gibson v. Martin*, 308 Mich. 178, 13 N.W.2d 252 (1944), the court held that pinball machines which award the winner free games or a return of their money was an illegal gambling device. However, the court in *People of the City of Ferndale v. Palazzolo*, 62 Mich.App. 140, 233 N.W.2d 216 (1975), held that if it is impossible to win free games, absent extraordinary skill, the pinball machine is not a gambling device.[2] However, M.C.L.A. § 750.303(2), enacted in 1975, exempts mechanical amusement devices from consideration as an illegal gambling device if the machine rewards less than sixteen (16) free replays at one time.[3]

Other case law has been equally inconsistent. *Raymond v. Green*, 194 Mich. 639, 161 N.W. 857 (1917) (slot machines are a gambling device); *Helber v. Schantz*, 109 Mich. 669, 67 N.W. 913 (1896) (betting on public elections is illegal gambling); *Henry v. Kuney*, 280 Mich. 188, 273 N.W. 442 (1937) (participating in pin or bagtelle games is illegal gambling); *Oatman v. Port Huron Chief of Police*, 310 Mich. 57, 16 N.W.2d 665 (1945) (slot machines are gambling devices); *Automatic Music*, 141 Mich.App. at 645, 367 N.W.2d 413 (a draw poker video machine is not a gambling device).

Further, the type of contractual agreement entered into has created significant differences of opinion in the Michigan courts. See *Gregory v. Wendell*, 40 Mich. 432 (1879) (a futures contract is not a gambling contract); *Shaw v. Clark*, 49 Mich. 384, 13 N.W. 786 (1882) (an option contract is not a gambling contract); *Raymond v.*

---

**2.** The *Palazzolo* court noted that since the *Gibson* decision, the manufacture and play of pinball machine had changed. Specifically, the current machines have "flippers" which were not a part of the machines in dispute in *Gibson.* As such, the *Palazzolo* court noted that modern pinball machines required a degree of skill and player involvement which was not present in 1944.

**3.** M.C.L.A. § 750.303(2) (Supp.1986) provides: (2) This section *shall* not apply to a mechanical amusement device which may through the application of an element of skill reward the player with the right to replay the mechanical

device at no additional cost if the mechanical amusement device *is* not allowed to accumulate more than 15 replays at 1 time; the device is designed so that accumulated free replays may only be discharged by reactivating the device for 1 additional play for each accumulated free replay; and the device makes no permanent record directly or indirectly of the free replays * * * awarded.
Also exempted are slot machines which are twenty-five (25) years old or older and are no longer used for gambling purposes. M.C.L.A. § 750.303(3) (Supp.1986).

*Leavitt*, 46 Mich. 447, 9 N.W. 525 (1881) (money advanced to corner the wheat market is illegal).

## C. CURRENT MICHIGAN STATUTES

As stated earlier, M.C.L.A. § 750.301 *et seq.* creates the central framework that gambling is impermissible in Michigan. Under these series of statutes, the Legislature considers betting pools (§ 304), gaming tables (§ 303), teletype dissemination of horse racing results (§ 305a), pool tickets (§ 306), and gambling on the margins of the future delivery of stocks (§ 311) as illegal gambling activities. As an interesting aside, the State punishes the gambling parties differently. Winners of gambling bets may be imprisoned while the losers are merely fined. M.C.L.A. §§ 750.314, 750.315.

Although the general Michigan law is to prohibit gambling, the Legislature has passed a series of laws which erode this

**4.** This was not always true. At one time, Michigan law prohibited horse racing:

> "All running, trotting or pacing of horses, or any other animals, for any bet or stakes, in money, goods or other valuable thing, excepting such as are by special laws for that purpose expressly allowed, shall be deemed racing within the meaning of this section, and are hereby declared to be common and public nuisances." Comp.Laws Supp.1940, § 17115–331, Stat.Ann. § 28.563.

**5.** One Michigan court has seen fit to distinguish horse racing from lotteries. Specifically, this Court found the distinguishing characteristic to be the skill involved in horse racing. As this Court stated:

> Under the above authorities it is clear that pari-mutuel betting on a horse race is not a lottery. In a lottery the winner is determined by lot or chance, and a participant has no opportunity to exercise his reason, judgment, sagacity or discretion. In a horse race the winner is not determined by chance alone, as the condition, speed, and endurance of the horse and the skill and management of the rider are factors affecting the result of the race. The better has the opportunity to exercise his judgment and discretion in determining the horse on which to bet. The pari-mutuel method or system of betting on a horse race does not affect or determine the result of the race. The pari-mutuel machine is merely a convenient mechanical device for recording and tabulating information regarding the number and amount of bets and from this information the betting odds on the horses entered can be calculated and determined

general rule. Many gambling activities are legalized after proper licensing by the State. Horse racing is a major example. Pari-mutuel wagering on horse racing is permitted. M.C.L.A. § 431.72(1).[4] Betting is allowed to only take place at the track and no one under eighteen (18) is permitted to place a wager. M.C.L.A. § 431.72(4), (5). Wagers placed on races other than those permitted under this statute, however, are illegal. M.C.L.A. § 431.80.[5]

Today, horse racing remains a favorite past-time in this State. Recently, the State permitted the Ladbrooke Detroit Race Course in Wayne, Michigan, to allow its patrons to place bets on the one hundred thirteenth (113th) running of the Kentucky Derby at Churchill Downs in Lexington, Kentucky. This was not permissible previously.

Michigan law also permits qualified organizations[6] to hold bingo, millionaire parties, and charity games. M.C.L.A. § 432.101 *et*

> from time to time during the process of betting. The recording and tabulating of bets could be done manually by individuals, but the pari-mutuel machine is a more convenient and faster method. The fact that a better cannot determine the exact amount he may win at the time he places his bet, because the odds may change during the course of betting on a race, does not make the betting a mere game of chance, since the better can exercise his reason, judgment, and discretion in selecting the horse he thinks will win. Horse racing, like foot racing, boat racing, football, and baseball, is a game of skill and judgment and not a game of chance.

*Rohan*, 314 Mich. 326, 346, 227 N.W.2d 433 (citations omitted).

**6.** M.C.L.A. § 432.103(6) (Supp.1986) defines the qualified organizations which may throw these parties:

> (6) "Qualified organization" means a bona fide religious, educational, service, senior citizens, fraternal, or veterans' organization which operates without profit to its members and which either has been in existence continuously as such an organization for a period of 5 years or is exempt from taxation imposed by Act No. *228* of the Public Acts of *1975*, as amended, being sections *208.1* to *208.145* of the Michigan Compiled Laws. *Qualified organization shall also include a candidate committee as defined by, and which is organized pursuant to, Act No. 388 of the Public Acts of 1976, as amended, being sections 169.201 to 169.282 of the Michigan Compiled Laws.*

*seq.* M.C.L.A. § 432.119 specifically exempts these activities from the State's penal statutes. A contradiction under this series of statutes is that while participants at millionaire parties may not place bets on athletic events or games of skill, these are the precise reasons that pinball machines and wagering on horse racing are permissible. Compare M.C.L.A. § 432.110a with *Rohan, supra,* and *Palazzolo, supra.*

Also permitted in the state is gambling on boxing and wrestling events; but those individuals who are required to get a license to participate in these sporting events are not permitted to gamble on the outcome. M.C.L.A. § 339.814.[7] Further, games of chance are sanctioned at annual Michigan State Fair. M.C.L.A. § 285.172.

Michigan's largest sanctioned gambling activity is the State sponsored lottery. P.A. 1980, No. 259, § 1 *et seq.,* M.C.L.A. § 432.1 *et seq.* creates a state sanctioned lottery and empowers a commissioner to handle the specifics of operating the lottery system. Although no one under eighteen (18) can play, they can receive a ticket as a gift. M.C.L.A. § 432.29. Forty-five (45%) percent of the total revenue must be apportioned as payment to the winning ticketholder. M.C.L.A. § 432.12.

### D. MICHIGAN'S PUBLIC POLICY REVISED

█ Based on the aforementioned, it is clear that the State sanctions State regulated gambling. Although it is continually articulated that gambling is illegal, immoral, and against public policy, the State Legislature has carved out exceptions for itself, entrepreneurs, and political committees.

The Court finds that it is the express public policy of Michigan to promote "legal" gambling. The State Legislature determines what is legal, authorizes it, and extracts a licensing fee. The State is preying on the weaknesses and ignorance of its citizenry to reap profits from the lottery and licensing fees.

Consistent with this, it is clear that Michigan does not prohibit "legal" gambling in other states. If a sister state chooses to legalize gambling or contracts for gambling, Michigan public policy would not be offended. Therefore, because Nevada chooses to legalize a debt incurred for the benefit of a gambling event, Michigan's public policy is not offended.

### IV. CONCLUSION

This Court finds the language of *Golden, supra,* persuasive. Defendant herein availed himself to the gambling facilities offered by a sister state. Instead of going to his Michigan bank, withdrawing funds and taking this currency with him, Defendant went to Nevada and exchanged $27,000 in promissory notes for an equivalent value in gambling chips. When Defendant lost all of his chips, he left Nevada and returned to Michigan. Defendant now refuses to pay on his outstanding notes.

The Court holds that the transaction between the Plaintiff's assignors and Defendant does not violate Michigan public policy, and thus Nevada law which holds these transactions valid is the law of the case. First, the Court finds that if it were to apply this Michigan statute so as to hold this transaction invalid, the statute would have an extraterritorial effect *beyond* its intention when enacted. Further, Michigan's interest in prohibiting this activity is minimal in this case. A competent, adult Michigan resident voluntarily chose to leave this state and wager his belongings on games of chance in another state. There is no argument that Defendant was forced to leave Michigan and gamble in Nevada. The State of Michigan cannot be

---

7. Those required to attain a license are:
   Sec. 806. (1) A promoter, boxing club, physician, referee, judge, matchmaker, timekeeper, announcer, professional boxer, professional wrestler, or a manager, trainer, second, or booking agent of those persons shall obtain a license from the department before participating either directly or indirectly in a boxing, sparring, or wrestling match or exhibition, and a person shall not profit directly or indirectly from a boxing or wrestling match or exhibition or participate directly or indirectly in the match or exhibition or in the receipts from a match or exhibition unless it is licensed by the department in advance under the classifications designated in this article *... Each applicant for a license as a promoter, referee or judge shall be of good moral character.*
   M.C.L.A. § 339.806(1) (Supp.1986).

in a position to protect its residents whenever they leave the state boundaries.

Finally, the social and moral interests of the public do not cry out that Defendant has been the victim of an illicit activity. As stated in *Golden*, gambling has become morally acceptable. In Michigan, there are daily and weekly state-run lottery games, horse racing tracks, odds on sporting events printed in every newspaper, and even church bingos. The Court would be blind to hold that gambling is morally and socially unacceptable in the State of Michigan. There is nothing illegal or immoral about the debt that the Defendant incurred.

In essence, M.C.L.A. § 600.2939(3) cannot be asserted to prevent Defendant from paying on debts he legally incurred while in the State of Nevada. Although the Court finds that the gambling laws of Michigan are repulsive and hypocritical, the Court holds that the State of Michigan has no public policy which would prevent Plaintiff from recovering on a debt owed to them. Therefore, this Court DENIES Defendant's Motion for Summary Judgment.

IT IS SO ORDERED.