**BOARDWALK REGENCY CORPORATION, d/b/a Caesars Atlantic City, Plaintiff,**

v.

**TRAVELERS EXPRESS COMPANY, INC. and John Jamil Kas–Mikha, Defendants.**

**No. 90–CV–70150–DT.**

United States District Court, E.D. Michigan, S.D.

Sept. 27, 1990.

Clark, Klein & Beaumont by Jonathan T. Walton, Jr., Thomas D. Dyze, Detroit, Mich., for plaintiff Boardwalk Regency Corp.

Dickinson, Wright, Moon, Van Dusen & Freeman by James A. D'Agostini, Terry W. Milne, Bloomfield Hills, Mich., for defendant Travelers Express Co., Inc.

Weinbaum, Abbo & Hoare by Peter Abbo, Southfield, Mich., for defendant John Jamil Kas–Mikha.

## OPINION

GILMORE, District Judge.

At issue in this case is whether, as a matter of public policy, Plaintiff can collect on money orders paid to discharge a gambling debt.

Initially, Defendant Travelers Express sought dismissal pursuant to Fed.R.Civ.P. 12(b)(6) of Count II of the complaint, which alleges breach of Drawee's contract, and summary judgment pursuant to Fed.R. Civ.P. 56 on Counts I and III of the complaint, which allege breach of the Drawer's contract and negligence. This Court, *sua sponte*, raised the issue of whether Michigan's public policy against gambling permits Plaintiff to collect on money orders that were paid to discharge a gambling debt in New Jersey. The Court finds that to allow Plaintiff to collect on the contract claims violates Michigan public policy.

## I

Defendant Travelers Express issues personal money orders, using a three-part snap-out form that contains a blue money order, a white reporting copy, which is returned to Travelers, and a yellow purchaser's receipt. A serial number appears on all copies of the form. Travelers sells its money orders through distributors nationwide by providing its distributors with a regulated number of blank money orders in trust for sale to purchasers.

When a money order is purchased, the distributor collects from the purchaser the face amount of the money order, plus a small fee. The distributor fills in the date of purchase and the amount of the money order, usually with a money order machine. The distributor tenders the instrument to the purchaser without signing the money order and without filling in the name of the payee. When the purchaser wants to tender the instrument, he signs the instrument, fills in his address, and completes the name of the payee.

The money orders are highly negotiable. Travelers' own handbook on procedures describes the money orders as follows: "Money orders are highly negotiable and must be handled with the same security used in handling cash." Mr. Federowicz, Manager of Credit Services for Defendant, stated in deposition that money orders "can be negotiated by virtually anybody in payment of—of whatever." (Deposition, p. 93).

On June 27, 1984, Defendant Travelers entered a Trust Agreement with Mars Party Store, owned by Co–Defendant Jamil Kas–Mikha, under which the store became a distributor of Travelers' money orders. The Agreement explicitly stated that a distributor was not permitted to use the money orders for its own obligations or for obligations of its agents, officers, or owners under any circumstances.

Sometime before December 26, 1989, Kas–Mikha stole 300 blank money orders from those given to the Mars Party Store. He completed each one, filling in the date as December 24, 1989, and filling in the maximum value permitted on each one— three hundred dollars ($300.00). He filled in "BRC" as payee, and signed his own name as purchaser. On December 26, 1989, he tendered all of the money orders ($90,000.00) to the Boardwalk Regency Corporation (d/b/a Caesar's Atlantic City). The casino accepted the money orders and in exchange discharged an existing debt and permitted Kas–Mikha to establish a gambling account at the casino. Kas–Mikha used this account to buy chips, and, after gambling, he cashed out his account with winnings of approximately $20,000.

On December 26, 1989, Caesar's presented the money orders to its depository bank, Midatlantic National Bank. When the money orders were presented to Travelers, it refused to honor them, arguing that they were stolen, that Travelers was not the Drawer, and that the money orders were used in violation of the Trust Agreement and the express terms on the back of each money order. Travelers returned all of the instruments to Caesar's stamped "Payment stopped."

On January 18, 1990, Plaintiff filed a six-count complaint against the Defendants, alleging breach of Drawer's contract, breach of Drawee's contract, negligence by Travelers, breach of warranty against Kas–Mikha, breach of contract against Kas–Mikha, and fraud against Kas–Mikha. The only issue before the Court in this opinion is whether enforcing payment of the money orders is in violation of Michigan public policy, a matter raised by the Court *sua sponte* in oral argument.

## II

Jurisdiction here is based upon diversity, and, therefore, the Court must apply the substantive law of the forum state. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). This necessarily means that courts sitting in diversity must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The general rule in Michigan is that the validity of a contract is determined by the law of the situs, or where the parties entered into the contract. *Rubin v. Gallagher*, 294 Mich.

124, 292 N.W. 584 (1940). A Michigan court, however, cannot apply the law of another jurisdiction if doing so would contravene the public policy of Michigan. *Miller v. Radikopf,* 394 Mich. 83, 228 N.W.2d 386 (1975); *Lieberthal v. Glens Falls Indemnity Co.,* 316 Mich. 37, 24 N.W.2d 547 (1946).

In *Muschany v. United States,* 324 U.S. 49, 65 S.Ct. 442, 89 L.Ed. 744 (1945), the Supreme Court said:

> Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest. As the term "public policy" is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy. It is a matter of public importance that good faith contracts of the United States should not be lightly invalidated. Only dominant public policy would justify such action.

*Id.* at 66, 65 S.Ct. at 451 (citations omitted).

As the Sixth Circuit recently pointed out in *Federal Deposit Ins. Corp. v. Aetna Casualty and Surety Co.,* 903 F.2d 1073 (6th Cir.1990):

> The Fourth Circuit more recently stated:
>
> > Were courts free to refuse to enforce contracts as written on the basis of their own conceptions of the public good, the parties to contracts would be left to guess at the content of their bargains, and the stability of commercial relations would be jeopardized.
> >
> > The power to refuse to enforce contracts on the ground of public policy is therefore limited to occasions where the contract would violate "some explicit public policy" that is "well defined and dominant, and [which] is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" [T]he usual and most important function of courts of justice is rather to maintain and enforce contracts, than to enable parties thereto to escape from their obligations on the pretext of public policy,
> > *unless it clearly appears that they contravene public right or the general welfare.*
>
> The court went on to state that questions of public policy are to be determined in the first instance by the legislature.

*Id.* at 1077–78 (quoting *St. Paul Mercury Ins. Co. v. Duke University,* 849 F.2d 133, 135 (4th Cir.1988)) (citations omitted) (emphasis added).

Courts in Michigan have long held that, as a matter of public policy, contracts made in furtherance of gambling are unenforceable, *Gibson v. Martin,* 308 Mich. 178, 13 N.W.2d 252 (1944), and loans made for gambling purposes cannot be recovered. *Raymond v. Leavitt,* 46 Mich. 447, 9 N.W. 525 (1881). And as recently as 1983, the Michigan Court of Appeals recognized that "gambling [is] an activity 'injurious to the morals and welfare of the people.'" *State ex rel. Comm'r of State Police v. Nine "Money Fall" Games,* 130 Mich.App. 414, 419, 343 N.W.2d 576, 578 (1983) (quoting *Parkes v. Judge of Recorder's Court,* 236 Mich. 460, 465–66, 210 N.W. 492 (1926)). In fact, with certain exceptions carved out by the Legislature, e.g. parimutuel horse racing, bingo, and the State sponsored lottery, gambling activity is illegal in Michigan. *See,* Criminal Law Provisions Against Gambling, M.C.L.A. §§ 750.301–315.

This Court recognizes that the public policy of the State regarding gambling is to be found in "its constitution, its statutes, the decisions of, or settled rules laid down by, its courts, and the prevailing social and moral attitudes of the community. If, however, the policy of the forum has been expressed positively in a statute, that policy must prevail." 16 Am.Jur.2d CONFLICT OF LAWS § 16 (1979) (footnotes omitted).

Michigan public policy regarding gambling contracts is explicit. Mich.Comp. Laws Ann. § 600.2939(3) provides:

> (3) **Instruments given in gaming or betting, validity.** All notes, bills, bonds, mortgages, or other securities or conveyances whatever, in which the whole or any part of the consideration, shall be for any money or goods won by playing at

cards, dice, or any other game whatever, or by betting on the sides or hands of such as are gaming, or by any betting or gaming whatever, or for reimbursing or repaying any moneys knowingly lent or advanced for any gaming or betting, shall be void and of no effect, as between the parties to the same, and as to all persons, except such as hold or claim under them in good faith, and without notice of the illegality of such contract or conveyance.

■ M.C.L.A. § 600.2939(3) is the conclusive statement of public policy regarding the validity of gambling contracts or conveyances. The Restatement (2d) CONTRACTS § 178 (1981), provides that "[a] promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable." Therefore, a statute need not formally recite that "this contract is against public policy and therefore void," in order to establish the public policy of the State. If a statute provides that a contract or conveyance is "void," then any claims based upon that contract or conveyance are unenforceable on grounds of public policy. Thus M.C.L.A. § 600.2939(3) establishes, as a matter of public policy, that instruments given in gambling are void.

■ Plaintiff argues, however, that honoring the money orders should not be considered against public policy because the money orders do not satisfy all the elements of M.C.L.A. § 600.2939(3). Plaintiff contends that they are not the type of instruments invalidated under the Statute, i.e., "notes, bills, bonds, mortgages, or other securities or conveyances ..." Plaintiff argues that the enumerated documents are all evidence of personal obligations utilized to obtain credit or transfer rights and property separate from the instruments themselves. Money orders, in contrast, are drafts that contain orders to pay, and function as cash equivalents. In addition, Plaintiff argues that the Statute's requirement that the instruments be given "in gaming or betting" also has not been met. Plaintiff claims that Travelers' obligations bear no relation to gambling, and Travelers was not involved in any gambling itself.

The Court does not agree with Plaintiff's position, and finds that all of the elements of M.C.L.A. § 600.2939(3) have been met. A money order is defined as, "[a] type of negotiable draft issued by banks, post offices, telegraph companies and express companies and used by the purchaser as a substitute for a check. Form of credit instrument calling for payment of money to named payee, and involving three parties: remitter, payee, and drawee." *Blacks Law Dictionary*, 5th Ed.1981, p. 907. A bill of exchange is defined as, "[a] three party instrument in which first party draws an order for the payment of a sum certain on a second party for payment to a third party at a definite future time," *Blacks, supra*, p. 149; "[a]n unconditional order in writing addressed by one person to another, signed by the person giving it requiring the addressee to pay on demand, or at a fixed or determinable future time, a sum certain in money to order or to bearer." *Bouvier's Law Dictionary*, 3d revision, p. 350.

Both parties agree that M.C.L.A. § 600.2939(3) prohibits gambling on credit. The definition of money order explicitly states that a money order is a form of credit. In addition, the statute clearly prevents the use of "bills" in gambling. The money order also falls under the definition of a bill of exchange, and, therefore, money orders are clearly covered by the Statute.

■ Furthermore, the money orders were given by Kas–Mikha "for reimbursing or repaying any money knowingly lent or advanced for any gaming or betting," because they were used in part to repay a prior gambling debt and in part to obtain chips with which to gamble. Plaintiff's contention, that Travelers' obligations bear no relation to gambling and that the Statute is inapplicable, is not sustainable. Moreover, the Statute states that gambling contracts or conveyances "shall be void and of no effect, as between the parties to the same, and as to all persons, except such as shall hold or claim under them in good faith, and without notice of the illegality of such contract or conveyance." Here, the

money orders are void because Travelers can be construed to be "all persons."

■ Nor can the Plaintiff here claim protection under the good faith exception of M.C.L.A. § 600.2939(3). After Plaintiff had accepted the money orders, but before it had redeemed them, an employee of Plaintiff called Travelers to verify the money orders. At that time, Plaintiff did not tell the Travelers' representative how the money orders had been used. In fact, at the bottom of an incident report generated by the phone call, Plaintiff's employee stated: "He [the Traveler's representative] does not know they were used for gambling." This evidence clearly shows that the money orders were used for gambling, and that Plaintiff did not try to claim them in good faith.

The Court cannot overlook, however, *National Recovery System v. Kasel*, 662 F.Supp. 139 (E.D.Mich.1987), a recent case in this District discussing M.C.L.A. § 600.2939(3). In that case, the Court determined that upholding contracts involving "legal gambling," including activities illegal in Michigan but legal in other states, was not contrary to the public policy of Michigan. The Court stated:

### D. MICHIGAN'S PUBLIC POLICY REVISED

■ Based on the aforementioned, it is clear that the State sanctions State regulated gambling. Although it is continually articulated that gambling is illegal, immoral, and against public policy, the State Legislature has carved out exceptions for itself, entrepreneurs, and political committees.

The Court finds that it is the express public policy of Michigan to promote "legal" gambling. The State Legislature determines what is legal, authorizes it, and extracts a licensing fee. The State is preying on the weaknesses and ignorance of its citizenry to reap profits from the lottery and licensing fees.

Consistent with this, it is clear that Michigan does not prohibit "legal" gambling in other states. If a sister state chooses to legalize gambling or contracts for gambling, Michigan public policy would not be offended. Therefore, because Nevada chooses to legalize a debt incurred for the benefit of a gambling event, Michigan's public policy is not offended.

*Id.* at 146.

This Court does not agree with the conclusions in *National Recovery*. Despite the fact that Michigan has legalized and actually participates in some gambling activity, the Statute holding instruments reimbursing gambling debts void remains on the books, as do many criminal statutes imposing criminal penalties for gambling. This Court recognizes that "when the [Michigan] Legislature enacts a law within the limits of the Constitution, the enactment insofar as it bears upon the matter of public policy, is conclusive." *Lieberthal v. Glens Falls Indemnity Co.*, 316 Mich. 37, 40, 24 N.W.2d 547, 549 (1946). Although the Court in *National Recovery* correctly points out the logical inconsistency in the State's policy of treating illegal gambling as against public policy, while promoting and allowing forms of legal gambling, so long as State policy against enforcing gambling contracts or conveyances remains on the books, this Court must conclude that enforcing such a contract or conveyance would violate Michigan public policy.

Indeed, the fact that the Michigan Legislature has passed other statutes legalizing certain forms of gambling does not alter the specific public policy established in M.C.L.A. § 600.2939(3). The public policy of the government is to be found in statutes that have "directly spoken" to the issue. *Skutt v. City of Grand Rapids*, 275 Mich. 258, 265, 266 N.W. 344 (1936) (quoting *United States v. Trans–Missouri Freight Ass'n*, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897)). Courts are to derive a public policy against the enforcement of promises from "legislation *relevant*" to that particular policy. Restatement (2d) CONTRACTS § 179 (1981) (emphasis added). The statutes cited in *National Recovery* concern the State lottery, parimutuel horse racing, bingo and certain other forms of gambling permitted in the State. Claims

**1272**

presented in this case, however, do not involve any of these enumerated exceptions to the general criminal prohibitions against gambling. Rather, claims here concern honoring instruments for the repayment of a gambling debt incurred at a casino. M.C.L.A. § 600.2939(3) directly speaks to this issue, and the specific public policy against honoring instruments given in gambling established in that Statute is not "revised" by the other statutes as stated in *National Recovery*.[1]

In *Miller v. Radikopf*, 394 Mich. 83, 228 N.W.2d 386 (1975), the Court examined statutes that, although related to the case, did not establish public policy regarding the specific claim. In *Miller*, the Court considered whether public policy permitted enforcement of a contract to share money won in the Irish Sweepstakes. The Court noted one statute which made it illegal to set up or promote a lottery, and another which made it illegal to sell or offer for sale lottery tickets. The Court determined, however, that these related statutes did not establish the State's public policy regarding the specific issue at bar—whether to enforce the contract. The Court stated that "[t]here being no statute barring enforcement of the claim asserted in this case, the question whether its enforcement would be in accord with public policy is for judicial decision." *Id.* at 87, 228 N.W.2d 386.

Here, in contrast, a Statute conclusively establishes public policy regarding claims asserted by directly barring enforcement of contracts for gambling debts. It is not this Court's province to then consider other tangentially related Legislation in order to defeat this clear statement of public policy. The Court in *Miller* recognized, as this Court recognizes, that statutes that do not address the specific claims of the case do not necessarily establish public policy regarding those claims. Even if the other statutes establish public policy in regard to State lotteries, parimutuel horse racing, etc., these statutes do not address the specific claims of this case, and do not affect this Court's responsibility to uphold the State's public policy as promulgated in M.C.L.A. § 600.2939(3).

The Court in *National Recovery* also determined that failure to enforce a contract to pay a gambling debt incurred in Nevada would "have an extraterritorial effect beyond its intention when enacted." *National Recovery, supra* at 146. This matter is one of first impression, and the Court finds no support for this determination.

The Court concludes that the instruments being sued upon here fall squarely under M.C.L.A. § 600.2939(3), and that the contract and warranty claims based upon those instruments are void as against public policy. Therefore, an order will be entered dismissing Count I alleging breach of Drawer's contract, Count II alleging breach of Drawee's contract, Count IV alleging breach of warranty against Kas–Mikha, and Count V alleging breach of contract against Kas–Mikha. The Court retains jurisdiction over the remaining claims, and will hear allegations under Count III for negligence by Travelers and Count VI for fraud against Kas–Mikha.

---

**1.** It is significant that even though the State has allowed the State Lottery, parimutuel betting and bingo gaming for charitable institutions, it has never permitted casino gambling.