ADAMAR OF NEW JERSEY, INC., Plaintiff, v CHASE LINCOLN FIRST BANK, N. A., Defendant.

Supreme Court, Monroe County, January 25, 1989

### APPEARANCES OF COUNSEL

*Harris, Beach, Wilcox, Rubin & Levey (Jeffrey W. Baker* of counsel), for plaintiff. *Phillips, Lytle, Hitchcock, Blaine & Huber (John T. Sullivan, Jr.,* of counsel), for defendant.

### OPINION OF THE COURT

RAYMOND E. CORNELIUS, J.

The plaintiff, Adamar of New Jersey, Inc., which operates

and does business as the Tropicana Hotel and Casino in Atlantic City, New Jersey, has made a motion for summary judgment in lieu of a complaint, pursuant to CPLR 3213, for money damages in the amount of $500,000. This sum represents the total face amounts of two cashier's checks of the defendant, Chase Lincoln First Bank, N. A., check No. 1451570 in the amount of $200,000, and check No. 1451584 in the amount of $300,000. The case presents novel questions involving the impact of the Casino Control Act of the State of New Jersey, as codified in New Jersey Statutes Annotated, title 5, chapter 12, and the regulations promulgated thereunder, upon the Uniform Commercial Code, as adopted in the State of New York.

Numerous affidavits have been submitted, both in support and opposition to the motion. However, many of the facts are not in dispute, or have not been contested for purposes of the motion, and the chronology of events may be briefly summarized. James E. Hawes was an employee of the defendant bank from January 17, 1983 until February 24, 1988. On January 28, 1988, in his capacity as a loan officer at the Midtown Plaza branch office, he obtained and signed the two official cashier's checks, in question, with the date, amount and name of payee blank, and left the checks on his office desk. According to an affidavit, signed by Mr. Hawes, one Joseph M. Thomas was present in his office on the same day, during which time Mr. Hawes left his office for a brief period of time. On February 2, 1988, Mr. Hawes, on behalf of the bank, issued a stop payment request because the two checks had been "lost" or "misplaced".

Also on January 28, 1988, and presumably subsequent to the aforementioned events in the Midtown Plaza branch office, an individual, who identified himself as Robert Capitano, made a telephone call to the Tropicana Hotel and Casino in Atlantic City, New Jersey, and spoke with Darrell Nonclerg, an assistant cage manager. The individual advised Mr. Nonclerg that he would be arriving at the casino later the same day, and would have in his possession a Chase Lincoln First Bank check in the amount of $200,000, which could be verified by calling James Hawes at the Midtown branch office. Mr. Nonclerg did make a telephone call to the bank, and spoke with Pat Haynes, who identified herself as the operations supervisor. In response to questions, Ms. Haynes represented that the check was good and there were sufficient funds to cover the check, but could not say whether or not a stop

payment order had been issued. In addition, she replied in the negative to several other specific questions concerning whether or not more than one authorization signature was required and whether the check had been issued from her bank and payable through a second bank on deposit.

Between 8:00 P.M. and 9:00 P.M. on January 28, 1988, the person, who identified himself as Robert Capitano, appeared at the cashier's window of Shelly Legg, an assistant shift supervisor at the casino. He presented a $200,000 check, drawn upon the defendant bank, which was dated January 28, 1988, and made payable to Robert Capitino, and requested that he be permitted to place the face amount of the check on deposit. Identification was requested, and a temporary New York State driver's license, in the name of Robert J. Capitano was produced. Unlike a permanent driver's license, this did not contain a photograph of the licensed driver. Ms. Legg noted the difference in spelling between the names on the driver's license and check, but was told that the payee's name on the check had been incorrectly typed by the bank. She requested that the individual indorse the check by signing both the incorrect and correct spelling of his name, and the person purportedly complied. However, an examination of the check discloses that the person indorsed the check as Robert Capitino and Robert Capitono. Indeed, the copy of the temporary driver's license, which has been supplied to the court, would appear to contain a signature with the latter spelling, although the license was issued in the name of Capitano. In any event, Ms. Legg retrieved a cash equivalent verification form, which had been previously prepared by Mr. Nonclerg, compared it to the check, and gave the individual a receipt showing that he had $200,000 on deposit in his name. Thereafter, incremental withdrawals were made and a total of $200,000 in gaming chips were allegedly issued to this individual.

On February 1, 1988, Darrell Nonclerg, the assistant case manager, was informed that the person, who identified himself as Robert Capitano, would be returning to the casino later that day with another check, drawn on Chase Lincoln First Bank, in the amount of $300,000, which could be verified by calling the bank's Midtown Plaza branch office. The same procedure was followed, as on the first occasion, and Mr. Nonclerg made a telephone call and spoke to Rosa Jones, as assistant manager of the bank. The same questions were posed, and the same answers received, with the exception that Ms. Jones reported that not only was the check good but there

were no stop payment or other restrictions on the check. On the evening of February 1, 1988, an individual appeared at the cashier's window at the casino, and presented a check in the amount of $300,000, dated January 28, 1988, and made payable to Robert Capi*a*no, to Van Bryant, a shift supervisor. Upon request the same temporary driver's license was exhibited for identification, following which the person indorsed the check as Robert Capit*o*no. Mr. Bryant then compared the check to a cash equivalent verification form, which had been previously prepared by Mr. Nonclerg, and the person was given a receipt indicating $300,000 on deposit. Incremental withdrawals were subsequently made, and a total amount of $300,000 in gaming chips were allegedly issued.

Plaintiff deposited the two checks, which ultimately were returned unpaid as a result of defendant's stop payment order. In response to the motion for summary judgment, the affidavit of Robert J. Capitano, whose address corresponds to the aforementioned temporary license, was submitted to the court. In essence, Mr. Capitano asserts that the indorsements on both checks constitute forgeries, and he denies being present at the Tropicana Hotel and Casino during January or February 1988. Although Mr. Capitano also denies that he applied for a driver's license and asserts that the signature appearing on the temporary license is not genuine, he does acknowledge receipt of a permanent license containing his description, but with a picture of his brother-in-law, Joseph Thomas. Criminal charges are currently pending against Mr. Thomas in the United States District Court, Western District of New York, as well as the Superior Court of New Jersey, County of Atlantic, in regard to the transactions involving the two checks.

In this case, the plaintiff asserts that it is a holder in due course of the two cashier's checks, and, as such, took the instruments free of any defenses of the defendant. (See, UCC 3-305.) In relevant part, a "holder" is one "in possession of * * * an instrument * * * issued or indorsed to him or to his order or to bearer or in blank." (UCC 1-201 [20].) Furthermore, and inherent in this very definition, plaintiff may not be a "holder" unless the checks were "negotiated by delivery with any necessary indorsement". (UCC 3-202 [1].) As already discussed, the check for $200,000 purportedly contained an incorrect spelling of the payee's name on the face thereof. Although an indorsement in that incorrect name would be effective, a person giving value for the instrument may require an indorsement in both the correct and incorrect names,

as requested by plaintiff in this case. *(See,* UCC 3-203.) Admittedly, the second indorsement on this check, as well as the $300,000 check, was also misspelled, or at least were spelled differently than the printed name appearing on the interim license. However, a signature made by use of any name, including an assumed name, or other symbol, with intention to authenticate a writing, would appear to be sufficient. *(See,* UCC 1-201 [39]; 3-401 [2].) In addition to the requirement of an indorsement, and the status of being a "holder", the plaintiff, in order to be a holder in due course, must also establish that the two checks were taken "for value", "in good faith", and "without notice" "of any defense against or claim to it on the part of any person." (UCC 3-302 [1] [a], [b], [c]; *also see, Marine Midland Bank v Price, Miller, Evans & Flowers,* 57 NY2d 220 [1982].)

If the plaintiff were not a holder in due course, the two checks would have been taken subject to a defense that these instruments were acquired by theft. (UCC 3-306 [d].) Furthermore, an unauthorized signature is generally inoperative as that of the person whose name is falsely signed, except as to "any person who in good faith pays the instrument or takes it for value." (UCC 3-404 [1].) In addition to the two checks, subject of this action, having been stolen and containing the unauthorized signatures of the payee, there is no question that they were materially altered by completion of otherwise incomplete instruments. (UCC 3-407 [1] [b].) Nevertheless, on the record before the court, it would appear that the loan officer, of the defendant bank, by his negligence, at the very least, contributed to the material alteration or to the making of the unauthorized signatures, and the bank would be precluded from asserting these defenses against a holder in due course. (UCC 3-406.) Indeed, a subsequent holder in due course may enforce an instrument, which was originally incomplete, as completed. (UCC 3-407 [3].) It should also be noted that these checks were cashier's checks and, as such, were accepted by the bank upon issuance. *(See, Dziurak v Chase Manhattan Bank,* 44 NY2d 776 [1978].)

Notwithstanding the foregoing sections of the Uniform Commercial Code, the defendant bank maintains that the plaintiff may not be a holder in due course because of the unique provisions of the New Jersey "Casino Control Act", and the administrative regulations promulgated thereunder. The New Jersey State Legislature, as a matter of public policy, undertook to strictly regulate this particular industry in order to

promote "public confidence and trust in the credibility and integrity of the regulatory process and of casino operations." (NJ Stat Annot § 5:12-1 [b] [6].) In accordance with this stated policy, the Casino Control Commission is granted authority to adopt regulations, and is specifically required to regulate the practice and procedures for negotiable transactions involving patrons of the casinos. (NJ Stat Annot §§ 5:12-69, 5:12-70 [g].) The statute specifically provides that "[a]ny check cashed, transferred, conveyed or given in violation of this act shall be invalid and unenforceable". (NJ Stat Annot § 5:12-101 [f].)

Generally, except for traveler's checks or "other cash equivalent", a casino may not accept a check to enable a person to take part in a gambling activity or give cash or cash equivalents in exchange for the check unless certain specified conditions are met, including compliance with the regulations concerning check cashing procedures. (NJ Stat Annot § 5:12-101 [b]; NJ Administrative Code § 19:45-1.25 [b].) The regulations, however, define cashier's checks as "cash equivalents", including: "cashier's checks * * * made payable to the presenting patron and endorsed in blank, provided, however, that no such instrument shall be accepted as a cash equivalent if the instrument was originally made payable to any person other than the presenting patron". (NJ Administrative Code § 19:45-1.1 [2].) Furthermore, the regulations provide that "cash equivalents * * * shall only be accepted at the cashier's cage by general cashiers", and the following procedure is mandated: "(3) Cash equivalents and casino checks, as defined in N.J.A.C. 19:45-1.1, shall only be accepted at the cashiers' cage by general cashiers. Prior to acceptance of any cash equivalent from a patron, the general cashier shall determine the validity of such cash equivalent by performing the necessary verification for each type of cash equivalent and such other procedures as may be required by the issuer of such cash equivalent. Prior to the acceptance of a cash equivalent made payable to the presenting patron or of a casino check pursuant to N.J.S.A. 5:12-101 (g), the general cashier shall examine that patron's identification credentials to ensure the patron's identity and shall maintain documentation supporting that examination." (NJ Administrative Code § 19:45-1.25 [e].) "Identification credentials", insofar as pertinent, include "a valid * * * driver's license * * * or other form of identification credential which contains, at a minimum, the patron's signature". (NJ Administrative Code § 19:45-1.1.)

In essence, the defendant maintains that the "presenting

patron", who presented the two checks in this case, was not the person to whom the instruments were originally made payable and, thus, under the regulations, the cashier's checks may not be considered as "cash equivalents". In a somewhat related argument, the defendant cites precedent in the State of New York to the effect that a gambling obligation may not be enforced in this State, unless validly contracted and enforceable in another jurisdiction. *(See, e.g., Intercontinental Hotels Corp. v Golden,* 15 NY2d 9 [1964]; *National Recovery Sys. v Mazzei,* 123 Misc 2d 780 [1984]; *National Recovery Sys. v Wonder,* 118 Misc 2d 1098 [1983].)* More specifically, the defendant maintains that plaintiff could not enforce its claim, in regard to the two cashier's checks, in the State of New Jersey because of the alleged failure to follow the required statutory and regulatory procedures, which results in the checks failing to constitute "cash equivalents" and, accordingly, could not be enforced in New York because they represent gambling debts. For the same reasons, defendant takes the position that plaintiff should not be deemed a holder in due course. However, all of these arguments rest upon a literal interpretation of the New Jersey regulation pertaining to "cash equivalents", to which this court cannot ascribe, absent decisional authority to the contrary. In effect, the defendant's interpretation would impose absolute liability upon a casino any time a cashier's check, for example, were fraudulently presented by a person representing himself to be the named payee. If this were the intent, there would be no need for the identification procedures, which have been set forth above, and the Legislature of the State of New Jersey and/or the Casino Control Commission could simply have made that determination. Nevertheless, for reasons hereinafter stated, this court holds that questions of fact are raised concerning plaintiff's claimed status as a holder in due course, under New York law, as a result of the New Jersey statutory and regulatory provisions governing the cashing of checks and, in particular, cashier's checks.

As already quoted from UCC 3-302, in order to become a holder in due course, one must not only take an instrument for value, but also in good faith and without notice of any defense. The term "good faith" is defined as "honesty in fact in the conduct or transaction concerned." (UCC 1-201 [19].) The general definition of the term "notice" is contained in the same section, and read as follows:

"A person has 'notice' of a fact when

"(a) he has actual knowledge of it; or

"(b) he has received a notice or notification of it; or

"(c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists." (UCC 1-201 [25].)

Certainly, there is a basis in this case for contending that the casino employees had "reason to know" that the two checks may have been forged or, at the very least, had reason to make further inquiry. However, this so-called objective standard or definition of notice has been specifically rejected by the Court of Appeals insofar as that term applies to a holder in due course of a negotiable instrument under article 3 of the Uniform Commercial Code. (*Chemical Bank v Haskell*, 51 NY2d 85 [1980].) The court noted that UCC 1-201 makes the definitions contained in article 1 subject to additional definitions contained in subsequent articles. Article 3 does include a section, which specifically sets forth what constitutes notice to a purchaser of an instrument, and this section concludes that to constitute notice of a defense, the purchaser must have "knowledge of the claim or defense or knowledge of such facts that his action in taking the instrument amounts to bad faith." (UCC 3-304 [7].)

Based upon the foregoing sections, the Court of Appeals reasoned that because UCC 3-304 (7) speaks in terms of "knowledge", and not the "reason to know" language used in UCC 1-201 (25) (c), a subjective standard should apply, and a purchaser must have "actual knowledge" before holder in due course status is denied. Otherwise stated, this interpretation, as applied to the language contained in UCC 3-304 (7), would result in a purchaser not being a holder in due course if he possessed actual knowledge of the "defense *or knowledge of such facts that his action in taking the instrument amounts to bad faith*" (emphasis added). Similarly, the Court of Appeals held that the definition of "good faith", as contained in UCC 1-201 (19), was a subjective, and not objective standard. If a purchaser, such as the plaintiff, "did not have actual knowledge of some fact *which would prevent a commercially honest individual from taking up the instruments,* then its good faith was sufficiently shown". (*Chemical Bank v Haskell, supra,* at 92 [emphasis added].) Although the standards have been designated as subjective, in nature, there may be a narrow range of cases, in which a purchaser may not have actual knowledge of a defense, but of facts whereby acceptance would be deemed

"bad faith" or "which would prevent a commercially honest individual from taking up the instruments". Thus, for instance, in the pending case, the casino employees had knowledge of the fact that the only identification presented was an interim license from an adjacent State and, unlike a permanent license, contained no photograph, and also of the inconsistency in the spelling of the payee's name. The latter fact is apparent from a comparison between the typewritten name of the payee, as it appeared on the face of each check, with the indorsements on the back thereof, and also comparing the interim license with the checks, as well as the second check with the first check. Within the strict statutory and regulatory framework of casino operations within the State of New Jersey, in regard to check cashing and identification procedures, it may well be contended that actual knowledge of such facts would have prevented a commercially honest casino operator from accepting the checks.

After a party, such as the defendant in the pending case, shows the existence of a defense, a party, claiming the rights of a holder in due course, has the burden of establishing such a status in all respects. (UCC 3-307 [3].) The court recognizes that the lack of knowledge of a defense or claim involves proof of a negative fact and, therefore, this burden of proof is a slight one. *(See, First Intl. Bank v Blackstein,* 59 NY2d 436 [1983].) Indeed, plaintiff has submitted the affidavits of the three casino employees, in which they assert, in essence, that the two checks were accepted without any actual knowledge of the defenses raised by the defendant bank. Nevertheless, the court has further concluded that questions of fact exist concerning whether or not acceptance of the two checks, based upon the facts known to these employees, amounted to good or bad faith, as above discussed. Accordingly, the motion for summary judgment should be denied.

Finally, the court agrees with the defendant that the instant action is not necessarily based upon instruments for the payment of money only and, therefore, a motion for summary judgment in lieu of a complaint, pursuant to CPLR 3213, was inappropriate. Again, if the New Jersey Casino Control Act, in regulations thereunder, be applicable, plaintiff will be required to show that the cashier's checks were accepted at the casino's cashier's cage by general cashiers, the necessary verification performed, and examination of the presenting patron's identification credentials. Unlike a cashier's check accepted under normal commercial conditions, plaintiff may

be required to establish proof of these facts, which are necessarily outside of the instrument. *(Cf., Abilities, Inc. v Citibank,* 87 AD2d 831 [2d Dept 1982].) Furthermore, these facts are all within the exclusive knowledge of the plaintiff, and defendant should be permitted discovery prior to a motion for summary judgment. *(See,* CPLR 3212 [f].) The motion papers in this case are exceedingly complex and, in its discretion, the court directs that a complaint be served within 20 days after service of a copy of the order to be entered hereon, with notice of entry and, thereafter, defendant shall serve its answer within 20 days after service of the complaint.