OPINION OF THE COURT
Edward H. Lehner, J.
The principal issue in this case is whether this State should enforce a loan agreement, executed in Israel between Israeli residents and to be performed there, which, as a consequence *799 of the provision calling for a variable rate of interest linked to the Israeli consumer price index, is claimed to result in a rate of interest that exceeds the maximum allowed by New York law.
FACTS
Plaintiff is an Israeli bank which makes loans to enable businesses to build factories in development areas in Israel, and to assist those that carry on a substantial export trade.
In 1978 defendant Jules Bier, having manufactured zippers in the United States and Mexico for a number of years, emigrated to Israel and established his business there by forming Flair (Israel) Ltd. (Flair). Between March 19, 1979 and January 29, 1985 Flair entered into eight loan agreements with plaintiff, securing the borrowings with the company’s assets. The complaint alleges that each loan was guaranteed by defendants.
Beset with labor and other economic problems, Flair ceased operations in June of 1985. Defendants then left Israel and now reside in New York, the circumstances under which they left the country being subject to differing accounts.
According to plaintiff, defendants "fled the country” and "deserted” the business "without even making provision to pay the workers’ salaries”.
Defendants’ version is that the company was having difficulty meeting its payroll and defendant Jules Bier "had been advised that if I were not able to meet the obligations of Flair to its employees, Histadrut would cause me to be thrown in jail and prevent me from leaving the country”. Defendants claim that they went to Germany and New York in order to seek outside investors for their business.
In defendants’ absence, plaintiff declared Flair in default of the loan agreements and exercised its rights thereunder to accelerate the debt and have a receiver appointed to sell the business. After the withdrawal of two prospective bidders, the receiver sold the business to the sole remaining bidder, which sale was approved by the District Court of Tel Aviv. The proceeds were then credited to Flair, reducing its obligation under the loan agreements. This action ensued.
In its second amended complaint, dated January 30, 1990, plaintiff seeks by its first cause of action to recover 5.6 million new Israeli shekels (NIS) from the guarantors, an amount reflecting the reduction by 4.3 million NIS of a claimed total *800 obligation under the loan agreements of 9.9 million NIS as of February 1, 1988. The second cause of action seeks attorneys’ fees pursuant to the guarantees. On this motion plaintiff seeks summary judgment only on the issue of liability.
CONTENTIONS OF THE PARTIES
Defendants contend that the sale of Flair’s assets, even though judicially approved, was riddled with fraud and was not commercially reasonable both with respect to the procedural circumstances of the sale as well as to the amount of the proceeds realized.
As to the claimed procedural failings, defendants assert that the receiver was appointed without notice to Flair’s principal and that the sale was to an entity related to plaintiff, and was consummated only after the two other bidders withdrew without explanation. Although the sale took place in June of 1985, defendants find it "curious” that the net proceeds had not been remitted to plaintiff by the time the complaint was amended on January 30, 1990, and assert that such fact is further evidence of fraud.
As to the substance of the transaction, defendants contend that the sale price was only one fifth of the value of Flair’s fixed assets. They point to plaintiff’s statement that it believed the net proceeds of the sale would be 4.3 million NIS, rather than the 903,795 NIS which plaintiff now claims was realized. It is argued that, had the sale been commercially reasonable, Flair would have had sufficient assets to satisfy the outstanding balance on the loans.
Defendants also contend that the loans were usurious and therefore should not be enforced since the interest rate was both compounded as well as indexed to Israel’s consumer prices, which were subject to inflation that at times exceeded 400% annually.
Plaintiff takes the position that the sale of Flair’s assets should be recognized as valid under the principle of comity. It argues that the law of Israel is similar to that of New York in that in both jurisdictions where the sale of collateral is judicially approved, it is conclusively deemed to be commercially reasonable. As to the deficiency sought, it argues that Israeli law governs since that jurisdiction has more significant contacts with the loan transaction, and that under such law the loan is enforceable.
In response, defendants contend that the Israeli court’s *801 approval of the sale by the receiver is not entitled to comity because: (i) they did not receive notice of the sale; (ii) of fraud underlying the proceeding; and (iii) recognition of the foreign judgment would seriously conflict with New York’s public policy against usury.
DISCUSSION
The parties apparently agree that the laws of New York and Israel are similar with respect to the procedure applicable to the sale of collateral, as they have both chosen to frame their legal arguments within the parameters of the Uniform Commercial Code.
The first question is whether the decision of the Israeli court approving the receiver’s sale of Flair’s assets conclusively establishes, pursuant to the doctrine of comity, that the disposition was commercially reasonable under UCC 9-507 (2) and 9-504 (3). UCC 9-507 (2) provides that a "disposition which has been approved in any judicial proceeding * * * shall conclusively be deemed to be commercially reasonable”.
In Altman v Altman (150 AD2d 304 [1st Dept 1989], appeal denied 74 NY2d 612) it was said (at 306-307):
"Under the doctrine of comity, full faith and credit will be accorded to a judgment of a foreign country unless it is established that the judgment is violative of a strong public policy or has been procured by extrinsic, as opposed to intrinsic, fraud. (Greschler v Greschler, 51 NY2d 368, 376; Tamimi v Tamimi, 38 AD2d 197.) The distinction between extrinsic and intrinsic fraud is defined as follows:
" ' "Intrinsic fraud is fraud which goes to the existence of a cause of action, and is held to be no defense. The American courts hold that a foreign judgment cannot be attacked on the ground that it was procured by false testimony * * *
" ' "The fraud which will be available to a [party] in his attack upon a foreign judgment, in the main, is fraud which has deprived him of the opportunity to make a full and fair defense. There are many varieties of such fraud. Thus, where the defendant failed to present his case because the plaintiff agreed to drop the suit or to compromise the case or notified the defendant that the proceeding had been dismissed, or by any other agreement or promise lulled the defendant into a false security, the judgment may be attacked by the defendant” ’. (Tamimi v Tamimi, supra, at 203-204 [quoting 2 Beale, Conflict of Laws § 440.4].) Thus extrinsic fraud ' "must *802 be in some matter other than the issue in controversy in the action” (See also, Robinson v Robinson, 120 AD2d 415 [1st Dept 1986], lv dismissed 68 NY2d 804.)
In the case at bar, defendants do not challenge the jurisdiction of the Israeli court and have offered no proof of extrinsic fraud. Rather, the claims are of fraud in the conduct of the foreclosure and sale, and not a deprivation of the opportunity to make a full and fair defense. It is observed that, although the sale took place in 1985, until the commencement of this action defendants (principals of the debtor as well as guarantors) did nothing to assail the propriety of the judgment of that court.
While defendants may not have appeared at the receiver’s sale, they do not dispute plaintiffs assertion that the sale was duly advertised. Although it has been held that a guarantor is considered a "debtor” under UCC article 9 and hence entitled to notice of a sale under UCC 9-504 (3) (Marine Midland Bank v Kristin Intl., 141 AD2d 259 [4th Dept 1988]; Chase Manhattan Bank v Natarelli, 93 Misc 2d 78 [Sup Ct, Monroe County 1977]), and that notice by publication is insufficient to satisfy the notice requirement of that section (Cate v Archon Oil Co., 695 P2d 1352 [Okla 1985]; Vermont Natl. Bank v Hamilton, 149 Vt 477, 546 A2d 1349 [1988]), the court finds that under the facts herein, where the location of defendants was unknown after their sudden and unexpected departure from Israel, publication was a sufficient means of satisfying the notice requirement.
Moreover, it has been held that where a sale is by a court-appointed receiver, the debtor and guarantor are not entitled to notice of sale. (Executive Bank v Tighe, 54 NY2d 330, 336 [1981].)
Nor should comity be denied on the ground that it presents "one of those 'rare instance[s]’ in which the public policy exception to the doctrine of comity must be invoked because enforcement of the judgment 'would result in the recognition of a "transaction which is inherently vicious, wicked or immoral, and shocking to the prevailing moral sense” ’ ” (Altman v Altman, supra, at 307), or "would conflict seriously with a compelling public policy” (Robinson v Robinson, supra, at 416; see also, Greschler v Greschler, 51 NY2d 368, 377 [1980]; Intercontinental Hotels Corp. [Puerto Rico] v Golden, 15 NY2d 9, 14 [1964]; Leflar, McDougal & Felix, American Conflicts Law § 84, at 251 [4th ed 1986]).
*803 Under Israeli law, plaintiffs rate of interest was permissibly linked to foreign currency exchange rates, compounded, and indexed to the cost of living in order to account for the rate of inflation. These provisions do not offend the prevailing attitude of our community. The concept of a bank in a developing country linking its interest rate to a price index to avoid loss as a result of volatile inflation (triple digit in the case of Israel) is hardly anathema. Development would lag if such indexing, which is prevalent in many aspects of Israeli economic life, were not permitted. It is noted that the basic predefault interest rate, before indexing, was always well below our 25% maximum.
A review of this State’s statutory scheme with respect to usury reveals not a monolithic prohibition, but a patchwork containing exceptions that take modern commercial practices and economic reality into account. The over-all picture presented is one of a legislative desire to protect the consumer in an unequal relationship, rather than to protect sophisticated commercial borrowers dealing at arm’s length. For example, under specified circumstances, loans at interest rates above that authorized under General Obligations Law § 5-501 (1) are permitted provided the rate is not in excess of the 25% maximum made criminal under Penal Law §§ 190.40 and 190.42 (e.g., General Obligations Law § 5-501 [6] [a] [loans in excess of $250,000 other than those secured by a one- or two-family residence]; §§ 5-523 [loans in excess of $5,000 secured by documents of title under UCC art 7 or negotiable instruments within UCC art 3 or 8], 5-525 [broker’s loans]), and in limited circumstances even the 25% limitation is made inapplicable (e.g., General Obligations Law § 5-501 [6] [b] [loans in excess of $2,500,000]; § 5-526 [1] [corporate loans in excess of $100,000]).
While the normal penalty for a usurious loan is forfeiture of principal and interest (General Obligations Law § 5-511), the penalty against banks is only loss of interest (General Obligations Law § 5-511; Banking Law § 108 [6]; § 202 [7]; § 235-b).
In Connor Gen. Contr. v Rols Capital Co. (145 AD2d 452 [2d Dept 1988]) it was stated (at 453-454): "The purpose of the usury laws generally is to protect poor people from the consequences of their own desperation * * *. Except in cases of criminal usury, neither a corporation nor the guarantor of a corporate debt may take advantage of the defense of usury (General Obligations Law § 5-521) and the courts of this State *804 are generally reluctant to extend the usury laws beyond cases which fall squarely under the statutes”.
Some courts, in order to avoid invoking the harsh remedy of forfeiture under the usury laws, have applied a special usury choice-of-law concept known as the "rule of validation”, i.e., apply the law of the jurisdiction whose usury statute would sustain the contract or impose the lightest penalty (e.g., Crisafulli v Childs, 33 AD2d 293 [4th Dept 1970]; Heller & Co. v Chopp-Wincraft Print. Specialties, 587 F Supp 557, 560 [SD NY 1982]; Speare v Consolidated Assets Corp., 367 F2d 208 [2d Cir 1966]). However, in Connor Gen. Contr. v Rols Capital Co. (supra) the Second Department noted that the Court of Appeals had not articulated a special concept for usury cases and declined to follow said rule, instead applying the usual center of gravity approach, stating (at 453) "that the law of the State having the most significant contacts with the matter in dispute will be applied * * * even where the matter in dispute is usury” (emphasis supplied).
Although in North Am. Bank v Schulman (123 Misc 2d 516 [County Ct, Westchester County 1984]), relied upon by defendants the New York usury laws were applied to a contract that stated it was to be governed by the laws of Israel, there the loan agreement and guarantee were executed in New York State at plaintiffs New York branch and the borrower was a Westchester County resident. Thus New York was held to have a "materially greater interest” than Israel in the outcome of the litigation.
Here the agreements and guarantees were entered into in Israel, the parties all resided in Israel at the time, and performance was to take place there. Under the circumstances, it has the most substantial relationship to these transactions, and it is the law of that country which should be applied. Since there is nothing to show that the law of Israel would invalidate the loan, it may be enforced here.
Although several affirmative defenses were raised in the answer (lack of jurisdiction, Statute of Limitations and loches), defendants have not pursued them in opposing plaintiffs motion.
In view of the foregoing, plaintiffs motion for summary judgment is granted as to the liability of Jules Bier with respect to all eight of the guarantees executed by him, and as to the liability of Natanel Bier with respect to the guarantees dated October 29, 1982, May 6, 1983, September 29, 1983, *805 February 19, 1984 and January 29, 1985 upon which his signature appears. Although a cross motion requesting such relief has not been made, since plaintiff concedes that Natanel Bier did not sign three of the guarantees, upon a search of the record, summary judgment is granted dismissing the complaint against him with respect to the guarantees dated March 19, 1979, July 31, 1981 and October 2, 1981.
Upon the filing of a note of issue and statement of readiness, the clerk shall place this action on the calendar for an assessment of damages.