IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
ASSIGNED ON BRIEFS JULY 14, 2000

## ROBINSON PROPERTY GROUP, L.P. D/B/A HORSESHOE CASINO AND HOTEL v. YO ANNE RUSSELL

**Direct Appeal from the Circuit Court for Shelby County**
**No. 97502 T.D.; The Honorable D'Army Bailey, Judge**

---

**No. W2000-00331-COA-R3-CV - Filed November 22, 2000**

---

This case arises out of a $23,800.00 debt incurred by appellee Yo Anne Russell at the Horseshoe Casino and Hotel in Robinsonville, Mississippi. The court below granted summary judgment to Yo Anne Russell because the court held that the debt represented by the drafts is unenforceable in Tennessee due to public policy considerations embodied in section 29-19-101 of the Tennessee Code. Plaintiff appeals from the court below, arguing that the trial court erred in granting summary judgment to Defendant Yo Anne Russell. For the reasons stated hereafter, we reverse the judgment of the trial court.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY KIRBY LILLARD, J., joined.

David A. Kirkscey, Memphis, for Appellant

Lawrence R. White, Memphis, for Appellee

**OPINION**

**Facts and Procedural History**

The appellant, Robinson Property Group, L.P., d/b/a Horseshoe Casino and Hotel ("Horseshoe") operates a casino and hotel in Robinsonville, Mississippi. The appellee, Yo Anne Russell ("Russell"), a Tennessee resident, approached Horseshoe in March of 1995 to obtain a "line of credit" to enable her to issue drafts to the casino. Initially, Russell obtained a $3,000.00 line of credit from Horseshoe by signing a credit application, furnishing the casino with a blank check and

a copy of her social security card, driver's license, and a bank credit card. Horseshoe informed Russell that if she did not pick up the drafts within thirty days, they would be presented to her bank for payment. Over the next two years, Russell signed a number of drafts. She then presented them to the cashier's window at which time she received cash. Russell was a slot machine player and was therefore given cash at the cashier's window instead of chips. There was no requirement that the funds be used in the casino.

Horseshoe found it necessary to present only two of the drafts to Russell's bank for payment in September of 1996. Both of these drafts were for $1,000.00, and both drafts were honored by Russell's bank. Over this period of time, Horseshoe increased Russell's limits. In October and November of 1996, Russell signed $23,800.00 worth of drafts. These drafts were presented to Russell's bank, but they were dishonored due to insufficient funds. Horseshoe's computer records reflect that Russell lost a total of $17,815.00 in the casino in October and November of 1996. Russell claims, however, that she lost all of the money loaned to her by Horseshoe. She claims that the reason Horseshoe's records do not reflect all of her losses is because she did not always insert her VIP card into the slot machines each time she played.[1]

Horseshoe began by suing Russell in Shelby County General Sessions Court and then the case was appealed to Shelby County Circuit Court. The Circuit Court Judge, the Honorable D'Army Bailey, granted summary judgment to Russell on the grounds that the debt represented by the drafts was unenforceable in Tennessee due to public policy considerations embodied in section 29-19-101 of the Tennessee Code.

## Standard of Review

We measure the propriety of the trial court's grant of summary judgment against the standard of Rule 56.04 of the Tennessee Rules of Civil Procedure, which provides that summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

When reviewing a grant of summary judgment, an appellate court must decide anew if judgment in summary fashion is appropriate. See Cowden v. Sovran Bank/Central South, 816 S.W.2d 741, 744 (Tenn. 1991); Gonzales v. Alman Constr. Co., 857 S.W.2d 42, 44-45 (Tenn. Ct. App. 1993). Since this determination involves a question of law, there is no presumption of correctness as to the trial court's judgment. See id.

## Law and Analysis

---

[1] A casino issued "VIP card" is used by the casino to track a player's length and amount of play. The card, however, must be inserted into a slot machine or checked in at a gaming table before the casino can track one's play.

The appellant presents three issues for our review, but we find only one to be dispositive. Specifically, the issue for our review is whether the trial court erred in refusing to give full faith and credit to the laws of Mississippi regarding the enforceability of the debt in question.

First, we must determine whether the transaction at issue is an ordinary debt or whether the transaction is a gambling contract. Corpus Juris Secundum states that even though gambling contracts often try to take the form of more legitimate contracts, "it is the duty of the courts to pierce this disguise and to ascertain the real activities involved." 38 C.J.S. *Gaming* § 26 (1996). Moreover, when dealing with a potential gambling contract, courts should determine the real intention of the parties. See id.

In the case of Nat'l Recovery Systems v. Bryer, 507 A.2d 1226 (Pa. Super. Ct. 1986), the court dealt with this same question. The court stated that "there is a presumption of gambling purpose where the transaction occurs in proximity to the gambling itself in terms of both time and space." Id. at 1227. Furthermore, the Bryer court used a test set out by the Nevada Supreme Court that is stated as follows:

> In determining the purpose [behind the indebtedness], the significance and relevancy of the surrounding circumstances and environment are readily apparent. If the advancement was made in a gambling establishment in full operation, by the proprietor or his agent, to one then, or immediately prior thereto, engaged in gambling and who ran short of money, the game still being in progress, or if his conversation or the circumstances indicated he intended to resume playing, the purpose of the advancement become[s] clear.

Id. (quoting Craig v. Harrah, 201 P.2d 1081 (1949)).

Applying the test to the instant case, it becomes clear that the cash advancements made by Horseshoe were made for gambling purposes. While the actual amount Russell lost at the casino is disputed, it is undisputed that Russell gambled and lost $17,815.00 of the $23,800.00 loaned to her by Horseshoe. Moreover, Russell was never more than a few feet away from the slot machines and other gambling activities when she drew on her line of credit at the casino. Under the aforementioned test, the facts of the instant case indicate that the "loans" made by Horseshoe were sufficiently proximate in time and place to Horseshoe's gambling activities as to be presumed for gambling purposes. Therefore, we find that the transaction at issue was a gambling contract.

The gaming transaction at issue between the parties was entered into in Mississippi. Although section 87-1-1 of the Mississippi Code makes gambling contracts void,[2] section 87-1-7 of

---

[2] Contracts, judgments, securities, conveyances made, given, granted, or executed, where the whole or any part of the consideration or foundation thereof shall be for money, or any valuable thing won, lost, or bet at any game
(continued...)

the Mississippi Code expressly exempts lawful gambling activities from the operation of the aforementioned statute making gambling contracts void.[3] Moreover, credit instruments, defined in section 75-76-5(g) of the Mississippi Code as documents evidencing a gaming debt owed to a licensed person, are expressly enforceable under section 75-76-175(1).[4] Thus, it is clear that the contract at issue was a lawful gambling contract pursuant to Mississippi law.

The next question we must answer is whether Tennessee must enforce the Mississippi gambling contract. We note that, "it is a familiar rule in Tennessee that the construction and validity of a contract are governed by the law of the place where the contract is made." Ohio Casualty Insurance Co. v. Travelers Indemnity Co., 493 S.W.2d 465, 466 (1973). Further, a contract is presumed to be made with reference to the law of the place where it was entered into, unless it appears that it was entered into with reference to the law of some other state. See Deaton v. Vise, 210 S.W.2d 665 (1948).

While Tennessee courts normally apply the law of the state where the contract was entered into, Tennessee courts may apply Tennessee law, regardless of the general rule of *lex loci contractus*, if giving effect to a foreign law would contravene a strong public policy of Tennessee. See Martin v. Dealers Transport Co., 342 S.W.2d 245, 249 (Tenn. Ct. App. 1960).

We must now examine Tennessee public policy on the issue of gambling. First, section 29-19-101 of the Tennessee Code states, "All contracts founded, in whole or in part, on a gambling or wagering consideration, shall be void to the extent of such consideration." Tenn. Code Ann. § 29-19-101 (1999). Additionally, one form of gambling, a lottery, is specifically proscribed by our state constitution at Article 11, section 5.[5] Thus, if the transaction at issue were entered into in Tennessee, it is evident that the contract would be void and unenforceable in a Tennessee court. It is important

---

[2](...continued)
or games, or on any horse-race, cock-fight, or at any other sport, amusement, or pastime, or on any wager whatever, or for the reimbursing or repaying any money knowingly lent or advanced for the purpose of such gaming or gambling, or to be wagered on any game, play, horse-race, cock-fight, or on any sport, amusement, pastime, or wager, shall be utterly void. Miss. Code Ann. § 87-1-1 (1999).

[3] Sections 87-1-1. . . shall not apply to contracts for future delivery which are valid under succeeding sections of this chapter and shall not apply to activity which is lawfully conducted pursuant to the regulatory authority of this act. Miss. Code Ann. § 87-1-7 (1999) (For reference to "this act", see Mississippi Gaming Control Act, enacted by Laws 1990, 1st Ex. Sess., Ch. 45, codified at § 75-76-1 et. seq.).

[4] "Credit instrument" means a writing which evidences a gaming debt owed to a person who holds a license at the time the debt is created, and includes any writing taken in consolidation, redemption or payment of a prior credit instrument. Miss. Code Ann. § 75-76-5(g) (1999).
A credit instrument accepted on or after June 29, 1991, is valid and may be enforced by legal process. Miss. Code Ann. § 75-76-175(1) (1999).

[5] The Legislature shall have no power to authorize lotteries for any purpose, and shall pass laws to prohibit the sale of lottery tickets in this state. Tenn. Const. Art. 11, § 5.

to remember, however, that the transaction at issue was not entered into in Tennessee. It was entered into in Mississippi where such transactions are legal.

This court has dealt with a similar question on two prior occasions. First, in <u>Hotel Ramada Inc., v. Thakkar</u>, No. 03A019103CV00113, 1991 WL 135471 (Tenn. Ct. App. 1991) (perm. app. denied), the defendant was a Tennessee resident who had executed seven negotiable checks totaling $19,000.00 in return for chips at a Nevada casino. The Defendant lost all of the money gambling at the casino. Thereafter, the Ramada Casino obtained a judgment in a Nevada court and sought to have the judgment enforced in Tennessee. While <u>Thakkar</u> is slightly different from the case at bar in that the casino in <u>Thakkar</u> was seeking to enforce a pre-existing judgment from another state, the public policy analysis is still the same. This court, in <u>Thakkar</u>, held that, "[o]ur review of the case law leads us to conclude that enforcement of a debt incurred in the purchase of gambling chips in a state where gambling is perfectly legal does not violate the strong public policy of this State." <u>Id.</u> at *3. Moreover, in discussing Tennessee public policy on the issue of gambling, this court in <u>Thakkar</u> noted that, "the Tennessee legislature has specifically provided for horse racing with the attendant pari-mutuel betting, which leads one to believe that gambling per se is not violative of Tennessee public policy."[6] <u>Id.</u> at *3.

Additionally, this court dealt with another similar case in <u>Mirage v. Pearsall</u>, 02A01-9609-CV-00198, 1997 WL 275589 (Tenn. Ct. App. 1997) (perm. app. denied). In <u>Mirage</u>, the defendant, a Tennessee resident, executed eight separate negotiable instruments to a Nevada casino totaling $100,000.00 in exchange for game chips. The defendant lost all of his game chips playing black jack at the casino. The eight instruments were subsequently dishonored. The casino then sued and obtained a default judgment against the defendant in Nevada. Thereafter, the casino sought to have the Nevada judgment enforced in Tennessee. The defendant in <u>Mirage</u> asserted the same argument that the defendant asserted in the present case; gambling is against the public policy of Tennessee and therefore full faith and credit should not be extended. This court, however, in <u>Mirage</u>, rejected that argument and held that Tennessee must give full faith and credit to the Nevada judgment.

The full faith and credit clause of the United States Constitution provides as follows:

> § 1. Full faith and credit to records and judicial proceedings of states.–Full faith and credit shall be given in each state to the ***public acts***, records, and judicial proceedings of every other state. And the Congress may by general laws prescribe the manner in which such acts, records and proceedings shall be proved, and the effect thereof.

U.S. Const. art. IV, § 1 (emphasis added).

---

[6] See Title 4, Chapter 36 of the Tennessee Code.

We note, as emphasized above, that the Full Faith and Credit Clause of the United States Constitution provides that not only are judgments from sister states to be given full faith and credit, but the public acts of each state shall be given full faith and credit as well.

When deciding whether to enforce another states' law, while discussing public policy considerations, Judge Cardozo stated,

> The courts are not free to refuse to enforce a foreign right at the pleasure of the judges, to suit the individual notion of expediency or fairness. They do not close their doors unless help would violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal.

Loucks v. Standard Oil Co., 224 N.Y. 99, 111 (N.Y. Ct. App. 1918).

Finally, we note the case of Intercontinental Hotels Corp. v. Golden, 254 N.Y.S.2d 527 (N.Y. 1964). The plaintiff in Golden sought to avoid enforcement of checks he had given a Puerto Rican casino to settle gambling debts which were legal there. The Golden court, while discussing defendant's public policy argument, stated, "injustice would result if citizens of this State were allowed to retain the benefits of the winnings in a state where such gambling is legal, but to renege if they were losers." Id. at 531. We too find that it would be a great injustice if Tennesseans could reap the benefits of gambling in states where it is legal when they are successful, but seek shelter in Tennessee courts when they lose. As a result, we conclude that there is nothing in the Mississippi laws in question that outrages the public policy of Tennessee. Therefore, the gaming contract between the parties is enforceable in Tennessee.

### Conclusion

Accordingly, for the aforementioned reasons, we hereby reverse the trial court and remand this case for a trial on the merits consistent with this opinion. Costs on appeal are taxed to Yo Anne Russell, and her surety, for which execution may issue if necessary.

_____

HIGHERS, J.

-6-