MAJOR LEAGUE BASEBALL PROP-
ERTIES, INC., National Football
League Properties, Inc., NBA Proper-
ties, Inc., NHL Enterprises, L.P.,
Plaintiffs,

v.

Steven PRICE, Barry Elgort, Lance
Kuba, Patricia Sullivan, Sean Sulli-
van, Marty Schwartz, Jeffrey Fish-
man, Irene Torres, Jon Rodriguez, and
all other similarly situated persons,
Defendants.

National Football League Players,
Inc., Plaintiff,

v.

Lance Kuba, Marty Schwartz, Irene Tor-
res, as Guardian ad litem for Jon Rod-
riguez on behalf of themselves and all
others similarly situated, Defendants.

Topps Company, Plaintiff,

v.

Steven Price, Barry Elgort, Irene Tor-
res, Jon Rodriguez, Bruce Laxer, and
all other similarly situated persons,
Defendants.

Nos. 98 CV 5894, 98 CV 5947
and 98 CV 6023.

United States District Court,
E.D. New York.

March 14, 2000.

Skadden, Arps, Slate, Meagher & Flom (James A. Keyte, Peter S. Julian Shepard Goldfein, of counsel), New York City, for plaintiffs Major League Baseball Properties, Inc., National Football League Properties, Inc., NBA Properties, Inc. NHL Enterprises, L.P., and Topps Co.

Weil, Gotshal & Manges (James W. Quinn, of counsel), New York City, for plaintiff National Football League Players, Inc.

Willkie Farr & Gallagher (Richard L. Klein and Martin B. Klotz, of counsel), New York City, for plaintiff Topps Co.

Milberg, Weiss, Bershad, Hynes & Lerach, LLP (Michael C. Spencer and Melvyn I. Weiss, of counsel) New York City, for defendants Lance Kuba, Marty Schwartz, and Steven Price.

Milberg, Weiss, Bershad, Hynes & Lerach, LLP (William Lerach, Alan Mansfield, Randall J. Baron and James Swiderski, of counsel), San Diego, CA, for defendants.

Milberg, Weiss, Bershad, Hynes & Lerach, LLP (Kevin P. Roddy, of counsel),Los Angeles, CA, for defendants.

Law Offices of Harry C. Batchelder, Jr. (Harry C. Batchelder, Jr., of counsel), New York City, for defendants.

Moritt, Hock & Hamroff, LLP (Neil J. Moritt and Alan S. Hock, of counsel), Garden City, NY, for defendants.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiffs, licensors and manufacturers of sports and entertainment trading cards (collectively "licensors and manufacturers"), bring this consolidated action for a declaratory judgment and an injunction against a defendant class of alleged sports and entertainment trading card purchasers (the "card purchasers"). The licensors and manufacturers seek a declaration that the card purchasers lack standing to sue for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c), because no card purchaser has shown that he has been "injured in his business or property by reason of" acts allegedly in violation of RICO, 18 U.S.C. § 1962(c), committed by licensors and manufacturers by engaging in a "pattern of racketeering activity" through acts of gambling "chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1)(A).

The card purchasers have moved to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) or, alternatively, to transfer or stay this action.

### I

The licensors own or have the right to license the names, symbols, and other marks of their respective sports leagues and member teams for use in the design and manufacture of sports trading cards. The manufacturers make, market, and distribute the cards.

Trading cards, when sold in retail stores, generally come in sealed packages containing between five and twelve cards. The identity of the cards is unknown until the package is opened. Some packages contain randomly placed limited edition cards, also known as "insert" cards, that have attributes, such as more colorful designs or depictions of more notorious persons, making those cards generally more attractive to card purchasers. The odds of receiving an insert card are printed on the packaging.

Collectors actively buy, sell, and trade sports cards in a secondary market consisting primarily of card stores, card conventions, and the Internet. Insert cards, because of their appeal, often, but not always, possess a higher value in this secondary market.

For the last three years, the card purchasers, represented chiefly by the attorneys in this case, have shopped around to find a forum "friendly" to their claims in order to induce a financial settlement. Card purchasers have brought thirteen virtually identical class action lawsuits in four different forums against numerous licensors and manufacturers of entertainment and sports trading cards, including, among others, the licensors and manufacturers in this case, claiming that the marketing and placement of insert cards constitute an unlawful gambling activity in violation of RICO.

From July 1996 through September 1996, the attorneys filed seven suits in the Eastern District of New York against licensors and manufacturers of trading cards, seeking treble damages, costs and attorneys' fees for "injury" to the card purchasers' "property" under RICO, 18 U.S.C. § 1964(c).

The attorneys also filed one suit in the Southern District of California against The

Upper Deck Co., one suit in the Northern District of Texas against Pinnacle Brands, Inc. ("Pinnacle"), and one suit in the District of New Jersey against The Score Board, Inc. Each of these three defendants make, market, and distribute trading cards and are not parties to the present action.

All seven suits in the Eastern District of New York and the one suit in the Northern District of Texas were dismissed for lack of standing under RICO. The Fifth Circuit affirmed the Texas District Court's dismissal. *See Price v. Pinnacle Brands, Inc.*, 138 F.3d 602 (5th Cir.1998). The attorneys for the card purchasers in the New York cases appealed to the Second Circuit, but thereafter withdrew the appeal.

The suit in the District of New Jersey was dismissed as to two of its claims and was dismissed as to a third claim without prejudice. The attorneys in that case subsequently filed an amended complaint. Its present status is unknown.

Meanwhile the card purchasers' attorneys brought a similar action in the United States District Court for the Southern District of California. That court dismissed the original complaint with leave to amend, *see Schwartz v. The Upper Deck Co.*, 956 F.Supp. 1552, 1560 (S.D.Ca.1997) ("Schwartz I"), and thereafter denied a motion to dismiss the amended complaint. *See Schwartz v. The Upper Deck Co.*, 967 F.Supp. 405, 417 (S.D.Cal.1997) ("Schwartz II").

After the California District Court's decision denying the motion to dismiss, the attorneys filed two more class action suits there against Pacific Trading Cards and Pinnacle, manufacturers of trading cards not parties in this action. Pinnacle had just obtained a dismissal in the Texas district.

On September 16, 1998, counsel for the card purchasers sent copies of a draft complaint to the licensors and manufacturers in this case and threatened to file new suits against them in the Southern District of California unless they agreed to pay a financial settlement. On September 22, 1998, and September 29, 1998, the licensors and manufacturers responded by filing the present declaratory judgment actions against the defendant class of card purchasers. The actions were later consolidated.

The attorneys for the card purchasers then followed through on their threat by filing suits in the California District Court against various licensors and manufacturers, including, among others, those sued in this District. These California actions are currently stayed pending the outcome of this declaratory judgment action.

Consistent with its earlier decisions, the California District Court denied motions to dismiss other complaints asserting substantially the same allegations as were contained in the previous cases. *See Dumas v. Fleer/Skybox Int'l, LP*, No. 99cv1739–B, slip op. (S.D.Ca. Dec. 21, 1999); *Dumas v. Major League Baseball Properties, Inc.*, 52 F.Supp.2d 1170 (S.D.Ca.1999); *Rodriquez v. The Topps Co.*, No. 98cv2121–B, slip op. (S.D.Ca. May 14, 1999).

## II

In order to put in context the basic difference between the New York courts' holdings with the contrary holdings of the California District Court, it is useful to set forth the reasoning of both sides as to whether the card purchasers have suffered a "property injury" within the meaning of RICO, 18 U.S.C. § 1964(c).

Congress enacted RICO "to combat organized crime, not to provide a federal cause of action and treble damages" for personal injuries. *Oscar v. University Students Co-operative Assoc.*, 965 F.2d 783, 785 (9th Cir.1992). To carry out its purposes, RICO's substantive provisions describe certain "prohibited activities," and, in pertinent part, make it "unlawful" for "any person" "employed by or associat-

ed with" any such "enterprise" to participate in the conduct of such enterprise's affairs through a "pattern of racketeering activity." 18 U.S.C. § 1962(c).

"Racketeering activity" means, among other things, "any act ... involving ... gambling ... which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1). A "pattern of racketeering activity" must include "at least two acts of racketeering activity...." 18 U.S.C. § 1961(5).

To enforce RICO the statute provides for extensive fines and other criminal penalties for violations of § 1962, including the forfeiture of property and imprisonment of up to a maximum of life. *See* 18 U.S.C. § 1963. RICO also enables the United States Attorney General to institute civil proceedings to restrain violations of § 1962 and to obtain orders requiring offenders to divest themselves of any interest in any enterprise. *See* 18 U.S.C. § 1964(a),(b).

In addition to the harsh and sweeping criminal and civil sanctions obtainable by federal officials, RICO provides in § 1964(c) that "[a]ny person *injured in his business or property* by reason of a violation of section 1962 ... may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee...." 18 U.S.C. § 1964(c) (emphasis added). To have standing to sue under this civil RICO provision, the plaintiff must adequately allege an "injury" from a racketeering act to his "business or property."

The distinguished Senior Judge in the California District case held that the card purchasers stated a claim under RICO because the manufacture and sale of packs of trading cards, some containing insert cards, amounted to a "pattern of racketeering activity" employed in violation of 18 U.S.C. § 1962(c). *See Schwartz II*, 967 F.Supp. at 414. More specifically, the court determined that the licensors and

manufacturers engaged in illegal lottery schemes, having the elements of chance, consideration, and prize, and were allegedly violating New York law. *Id.* at 411–14 (citing New York Penal Code § 225.10).

The California District Court held that the card purchasers satisfied § 1964(c)'s "injury" requirement because the licensors' and manufacturers' illegal lottery schemes caused injury to the card purchasers' "property." As the court explained, the price paid for a pack of cards contained two components: a portion was for "regular" cards and a portion was for the chance to receive an insert card. *Schwartz II*, 967 F.Supp. at 411. Because New York in the New York General Obligations Law § 5–423 provides a statutory right for individuals to bring suit for "gambling losses," the court reasoned that card purchasers "suffered damage for the amount they ... expended on chances of winning [insert] cards," minus their gambling winnings. *Id.* at 414 n. 8. The court characterized this injury as a "tangible loss" on "a fixed amount," though it would be necessary first to establish precisely what portion of the purchase price was paid for the chance. *Schwartz II*, 967 F.Supp. at 414, 414 n. 8.

The California court's theory seems to be that the New York statutory right of a card purchaser to recover gambling losses renders the consideration paid for the chance "lost property," and that this creates a RICO "property injury." Apparently without such a New York statutory right, card purchasers would lack the necessary standing. *See Schwartz I*, 956 F.Supp. at 1557 ("[g]iven that New York ... law allow[s] recovery of gambling losses, plaintiffs have standing to sue under § 1962(c) of RICO to recover the amount they have spent attempting to buy [insert] cards."). In the California court's view, section 5–423 of the New York General Obligations Law thus transmogrifies a portion of the consideration paid by the individual card purchaser into RICO "proper-

ty" subject to being "injured." To reach its conclusions about the existence of a RICO "property injury," the California District Court assumed that the act of selling a pack of cards to a card purchaser—the act allegedly causing the RICO "property injury"—meets the definition of "racketeering activity" found in section 1961(1) of RICO. For an "act" to constitute "racketeering activity," it must, in pertinent part, be "chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1).

In fact, no statutory provision in New York law penalizes the individual sale to a "person" of a pack of trading cards with "imprisonment for more than one year." The only provision that might apply to a sale to a "person" of a pack of trading cards is Penal Code section 225.05, which makes someone guilty of the misdemeanor offense of "promoting gambling in the second degree when he knowingly advances or profits from unlawful gambling activity." But such activity is not "racketeering activity" under section 1961(1) of RICO because it constitutes a misdemeanor and not a felony, and so is not "punishable by imprisonment for more than one year."

New York Penal Code section 225.10, which the California District Court cites, makes a person guilty of the felony offense of "promoting gambling" in the first degree, but only when he knowingly advances or profits from unlawful gambling activity by (1) "engaging in bookmaking to the extent that he receives or accepts in any one day more than five bets totaling more than five thousand dollars" or (2) receives in connection with a "lottery" (a) money from a person "other than a player whose chances or plays are represented by such money," or (b) "more than five hundred dollars in any one day of money played in such scheme or enterprise." New York Penal Code § 225.10.

Though "promoting gambling" in the first degree is a felony and therefore "punishable by imprisonment for more than one year," there is nothing in New York Penal Code § 225.10 that would on its face punish a manufacturer or licensor for the sale of a pack of cards to a single "person" unless such a pack of cards were sold for more than five hundred dollars. In the pleadings of the card purchasers no claim of an individual card purchaser asserts that the price for a pack, let alone the "price" for the "chance" of obtaining an insert card, was more than five hundred dollars.

In short, a sale in New York of such a pack to an individual card purchaser does not meet the RICO definition of an "act" of "racketeering activity". 18 U.S.C. § 1961 and 1962(c). It follows that in New York no card purchaser has been "injured" in his or her "business or property" as defined in section 1964(c) of RICO.

Even if the sale of a pack of cards to an individual "person" were considered "racketeering activity," this court does not adopt the California District Court's analysis as to the nature of the actual transaction and the New York statutory right to recover gambling losses.

A card purchaser buying a pack of cards enters into a bargain with the licensors and manufacturers whereby in return for payment the purchaser will receive a random assortment of regular cards and a chance to receive an insert card. This bargain delivers actual value to each party because the chance itself is of value regardless of whether or not the card purchaser later suffers a "loss." *Cf. In re Chomakos*, 69 F.3d 769, 770–71 (6th Cir. 1995) (explaining that a bettor's chance to win when engaged in lawful gambling "has economic value"). The bargain is not for a phantom chance. Just as a card purchaser may realize a gambling loss, so a card purchaser may also find an insert card and sell it or keep it for value. The chance is real, and having paid for it and received it, the card purchaser has not suffered any financial loss or RICO property injury.

The illegality and voidness of the gambling transaction, *see* N.Y. Gen. Oblig. L.

§ 5–411, does not change this fact. The only effect this section has on the exchange is that it prevents the parties from seeking legal enforcement of the bargain. But the unavailability of such enforcement does not mean that the exchange giving rise to the present lawsuits had no economic value to the parties, or that it had a negative economic value to the card purchasers. The purchasers received a benefit regardless of the transactions' illegality or voidness. The situation might be different if the licensors and manufacturers caused some tangible financial loss by misrepresenting the odds or by some other swindle, *see, e.g., In re Taxable Municipal Bond Securities Litigation*, 51 F.3d 518, 522 (5th Cir.1995). But the card purchasers make no such allegations.

The recoverability of the money spent means only that card purchasers have a claim under state law. But as the Fifth Circuit stated: "it does not follow@ that any injury for which a plaintiff might assert a state law claim is necessarily sufficient to establish a claim under RICO." *See Price*, 138 F.3d at 607; *see also Heinold v. Perlstein*, 651 F.Supp. 1410 (E.D.Pa.1987) ("[T]hat plaintiff cannot proceed under RICO does not mean that he has no remedy for the harm defendant allegedly caused him. It means only that plaintiff must proceed pursuant to a statute or common law cause of action under which he has standing to sue.").

In this case, the New York statutory right to recover gambling losses would create a RICO "property" injury only if that statutory right retroactively transformed into lost property the consideration paid for the chance.

Certainly the statutory right to recover gambling losses does not mean that any consideration paid for a gambling transaction is inherently injurious. The Constitution of the State of New York authorizes certain "lotteries" and "pari-mutuel betting on horse races" that are "operated by the state" or "prescribed by the legislature," as well as certain bingo- or lotto-type "games of chance" run by "bona fide religious, charitable or non-profit organizations," where "no single prize shall exceed two hundred fifty dollars." N.Y. Const., art. I, § 9.

The New York Court of Appeals explained, in *Intercontinental Hotels Corp. v. Golden*, 15 N.Y.2d 9, 254 N.Y.S.2d 527, 203 N.E.2d 210 (1964), that the "trend in New York State demonstrates an acceptance of licensed gambling transactions as a morally acceptable activity, not objectionable under the prevailing standards of lawful and approved social conduct in a community." *Golden*, 15 N.Y.2d at 14, 254 N.Y.S.2d 527, 203 N.E.2d 210; *see also Harris v. Economic Opportunity Comm'n*, 171 A.D.2d 223, 575 N.Y.S.2d 672, 677 (2d Dep't 1991) (noting that the "benefits of [illegal charitable gambling] are apparently well recognized").

The *Golden* court answered affirmatively the question of whether gambling debts validly entered into in other jurisdictions were enforceable in New York, even though the same gambling transaction would be illegal in New York. *See Golden*, 15 N.Y.2d at 17, 254 N.Y.S.2d 527, 203 N.E.2d 210. Clearly, New York law has not pronounced gambling to be an inherently injurious activity.

The *Golden* court explained that the critical distinction between acceptable and unacceptable gambling was whether the activity had any "assurance of fairness or honesty in the operation of the gambling devices." *Id.* at 15, 254 N.Y.S.2d 527, 203 N.E.2d 210. Because of this distinction "[i]nformed public sentiment in New York is only against unlicensed gambling, which is unsupervised, unregulated by law and which affords no protection to customers." *Id.* The mere illegality of a gambling transaction does not mean that it must be injurious. More important is whether the activity is run fairly and honestly. In this case, nothing alleged by the card purchasers indicates that they suffered property injury from unfair or dishonest conduct.

A more particular issue is the nature and purpose of the New York statutory right to recover gambling losses and what effect it has on the gambling transaction. At common law, "persons gambling together were considered in *pari delicto* and the law left them to their own remedies," *Aiello v. Queens County Jockey Club*, 208 Misc. 445, 144 N.Y.S.2d 322, 323 (Sup.Ct. N.Y.Cty.1955), meaning that losers could not seek the courts' aid to recover gambling losses. But this rule apparently did little to help effectuate the purposes of the gambling prohibitions, which "were adopted with a view toward protecting the family man of meager resources from his own imprudence at the gambling tables." *Golden*, 15 N.Y.2d at 15, 254 N.Y.S.2d 527, 203 N.E.2d 210.

To remedy this situation, the legislature enacted the statutory right to recover gambling losses "to discourage the business of selling lottery tickets." *Grover v. Morris*, 73 N.Y. 473, 477 (1878). As an early New York Court of Appeals decision further explained, " 'curb the professional [gambler] with his constant offer of temptation coupled with ready opportunity, and you have to a large extent controlled the evil.' " *Bamman v. Erickson*, 288 N.Y. 133, 138, 41 N.E.2d 920 (1942) (quoting *Watts v. Malatesta*, 262 N.Y. 80, 82, 186 N.E. 210 (1933)).

What these authorities make clear is that the statutory right to recover gambling losses is directed only toward the purpose of eliminating the lottery promoter's financial incentive. Such a statutory right does not have any retroactive effect on the card purchaser's consideration or by itself indicate that gambling transactions are inherently injurious. *Aiello*, 144 N.Y.S.2d at 323 ("The right of recovery is purely statutory and should be restricted to the extent and area clearly defined by law."). With its limited purpose and sphere, the statutory right shares no nexus with federal RICO. The card purchasers, having received exactly what they bargained and paid for and having never al-leged they were denied the benefit of their bargain, do not meet the "injury" requirements of RICO.

While the complaining card purchasers did not find an insert card in the packs they bought, and while they and their attorneys may have looked forward to harvesting a ripe plum at relatively little cost, they certainly have not been the victims of a nationwide scourge requiring a nationwide remedy.

### III

The card purchasers argue for dismissal of the action against the class on the grounds that (1) there is no federal question jurisdiction; (2) there is no actual controversy between the parties; (3) plaintiffs cannot receive injunctive relief under the Declaratory Judgment Act; (4) the defendant class is impermissible under the Federal Rules of Civil Procedure; (5) this court should in its discretion decline to hear this declaratory judgment action; and, alternatively, (6) this court should transfer this action to California, or stay this action pending the outcome of the California actions.

#### *Federal Question Jurisdiction*

■ The card purchasers argue that this court lacks subject matter jurisdiction because the declaratory judgment action does not satisfy the federal question requirements of 28 U.S.C. § 1331. They point out that the Declaratory Judgment Act, 28 U.S.C. § 2201, is not a jurisdictional statute and that plaintiffs lack an independent basis for jurisdiction.

Though § 2201 does not provide federal question jurisdiction, *see West 14th Street Commercial Corp. v. 5 West 14th Owners Corp.*, 815 F.2d 188, 194 (2d Cir.1987), federal question jurisdiction can arise from a declaratory defendant's threatened action if that action would necessarily raise a substantial federal question. *See Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust for S. Cal.*, 463 U.S.

1, 19, 103 S.Ct. 2841, 2851, 77 L.Ed.2d 420 (1983) ("Federal courts have regularly taken original jurisdiction over declaratory judgment suits in which, if the declaratory judgment defendant brought a coercive action to enforce its rights, that suit would necessarily present a federal question."); *Cardtoons, L.C. v. Major League Baseball Players Ass'n,* 95 F.3d 959, 964 (10th Cir. 1996) ("federal question jurisdiction exists in a declaratory judgment action if the potential suit by the declaratory judgment defendant would arise under federal law"); *Levin Metals Corp. v. Parr–Richmond Terminal Co.,* 799 F.2d 1312, 1315 (9th Cir.1986) (same); *West 14th Street Commercial Corp. v. 5 West 14th Owners Corp.,* 815 F.2d 188, 194 (2d Cir.1987) (same).

In this case, the card purchasers threatened to sue the licensors and manufacturers under RICO. Further, they acted on that threat and filed suit in the Southern District of California. Clearly their threat was real. This court has federal question jurisdiction under § 1331.

The card purchasers respond that the threatened suit's federal character matters only in intellectual property disputes. The cases show otherwise. Federal question jurisdiction is clearly not so limited. *See, e.g., West 14th Street,* 815 F.2d at 191 (Condominium and Cooperative Abuse Relief Act, 15 U.S.C. §§ 3601 *et seq.*); *Kidder, Peabody & Co. v. Maxus Energy Corp.,* 925 F.2d 556 (2d Cir.1991) (Securities Exchange Act of 1934).

### Actual Controversy

■ The card purchasers also argue that the licensors and manufacturers lack standing to sue because they have not alleged an "injury in fact." According to the card purchasers the licensors and manufacturers "claim that they are being extorted" by the card purchasers in the California actions so as to be "compelled to incur the cost of defending against the pending class actions." The card purchasers would have the court believe that the

licensors and manufacturers claim that their injury is defending against a "pre-existing action."

■ This characterization is inaccurate. Whether an actual controversy exists depends on whether " 'the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' " *Kidder, Peabody,* 925 F.2d at 562 (quoting *Golden v. Zwickler,* 394 U.S. 103, 108, 89 S.Ct. 956, 959–60, 22 L.Ed.2d 113 (1969)). The facts show the existence of an actual controversy. The latest harassing actions by the card purchasers did not pre-exist the filing of the declaratory judgment actions. Moreover, the licensors and manufacturers were surely entitled to sue when they were threatened with further harassing litigation and wished to avoid defending themselves against what they regarded as baseless claims. The substantial costs of defending against threatened, immediate, and real litigation is certainly a cognizable injury. *See Kidder, Peabody,* 925 F.2d at 562–63.

### Injunctive Relief

■ The card purchasers also argue that this court cannot redress the harms alleged in the case because RICO does not authorize injunctive relief. But the action is not brought under RICO. It is brought under the Declaratory Judgment Act. Injunctive relief under that act is available regardless of its unavailability under RICO. *See* 28 U.S.C. § 2202; *Powell v. McCormack,* 395 U.S. 486, 499, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

### Permissibility of Defendant Class

■ The card purchasers argue that neither Rule 23(b)(1) or (2) can provide grounds for the defendant class because the injunctive remedy sought could not be enforced against absent class members and because granting declaratory relief without notice and the opportunity to opt

out to class members would violate their due process rights.

■ The Due Process Clause does not require notice or the opportunity to opt out to absent class members in a Rule 23(b)(1) or (2) class action so long as the named defendants adequately represent the class in the suit. *See Marcera v. Chinlund,* 595 F.2d 1231, 1240 n. 13 (2d Cir.1979). "In the class action context, notice is simply a means for assuring such adequacy, not an end in itself." *Id.*

*Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), is not contrary authority. *Shutts* requires notice and an opportunity to opt out in a Rule 23(b)(3) class action for money damages. The Supreme Court expressly limited its holding to actions for money damages. *See Shutts,* 472 U.S. at 811–12, 811 n. 13, 105 S.Ct. 2965 ("We intimate no view concerning other types of class actions, such as those seeking equitable relief."). No convincing reasons have been offered to expand the rule of *Shutts* to the present case.

In any event, there is little doubt whether the named defendants would adequately represent the class. Each class member shares a common interest in his or her standing to sue under RICO. Thus representatives defending their own interests would also protect the class's interests. *See Monaco v. Stone,* 187 F.R.D. 50, 65 (E.D.N.Y.1999). Contrary to what defendants suggest, it makes no difference whether the defendant representatives are unwilling. Adequate representatives are all that is required. *Marcera,* 595 F.2d at 1239. Moreover, defendants also have skilled and experienced counsel, who presumably hope to recover a huge sum and handsome fees. *See DeAllaume v. Perales,* 110 F.R.D. 299, 306 (S.D.N.Y.1986).

The adequacy of representation also refutes defendants' other arguments that any injunctive relief would be unenforceable against absent class members. The Second Circuit has clearly stated that "due

process permits binding absentees to a judgment with respect to common questions of law if they have been adequately represented in the suit." *Marcera,* 595 F.2d at 1240 n. 13.

Defendants' concerns about the defendant class do not provide a basis for dismissal. The court does not reach other issues as to the permissibility of the class. Class certification is not yet at issue.

### Discretionary Dismissal and Alternative Request for Transfer or Stay of Action

The card purchasers ask this court to use its discretionary authority to decline to hear this declaratory judgment action. As justifications they say that the California actions will resolve all the issues and that the licensors and manufacturers filed this anticipatory suit to forum-shop. Defendants alternatively request a transfer of this action to California, or a stay pending resolution of the California actions.

■ Defendants' requests have been rendered moot in light of the California District Court's recent decision to stay the California actions pending this court's resolution of the present action. *Dumas v. Major League Baseball Properties, Inc.,* 52 F.Supp.2d 1183, 1195 (S.D.Cal.1999).

■ In any event, the circumstances do not warrant any discretionary declination, transfer or stay order. Almost all of the named parties and many of the relevant witnesses and documents are located in New York. Furthermore, the card purchasers' lament that they are the victims of forum-shopping can hardly be serious. They initially chose this district to litigate their claims and have not been denied their choice of forum.

More fundamentally, defendants' onslaught of litigation against licensors and manufacturers of trading cards makes this an important and particularly appropriate case for declaratory judgment. As the Second Circuit put it: " '[A] declaratory judgment action should be entertained

when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and ... when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Kidder, Peabody*, 925 F.2d at 562 (quoting *Fort Howard Paper Co. v. William D. Witter, Inc.*, 787 F.2d 784, 790 (2d Cir.1986)).

Defendants and their law firms have brought thirteen separate cases in four different forums, at times re-filing suits against opponents previously victorious in other forums, all in an effort to coerce financial settlements. This harassment and intimidation has doubtlessly created uncertainty, insecurity, and controversy. A declaration of the legal relations between the defendant class and plaintiffs would afford relief, both to the plaintiffs and to the federal court system.

The card purchasers first filed their suit in the Eastern District of New York. There is no more appropriate district to try the issues.

### IV

Defendants' motion to dismiss the complaint is denied.

So ordered.